SHAW, Judge.
 

 Timothy W. Saunders was convicted of two counts of capital murder in connection with the murder of 77-year-old Melvin Clemons, and one count of attempted murder with respect to 74-year-old Agnes Clemons,
 
 [1]
 
 Mr. Clemons’s wife.
 
 [2]
 
 The murder of Mr. Clemons was made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975, and because it was committed during the course of a burglary in the first degree, see § 13A-5-40(a)(4), Ala.Code 1975. The jury unanimously recommended that Saunders be sentenced to death for his capital-murder convictions. The trial court accepted the jury’s recommendation and sentenced Saunders to death. In addition, the trial court sentenced Saunders to life imprisonment for the attempted-murder conviction.
 

 The evidence adduced at trial indicated the following. In 1974, the Clemonses had purchased a 20-acre parcel of land in Foley and had built a house on the property. They operated a business known as Curly’s Pecans
 
 [3]
 
 on Underwood Road. Mrs. Clemons testified that on July 9, 2004, she and her husband spent part of their day working on a house-remodeling project and then worked in the yard together. When they stopped working outside, it was not yet dark. After he came inside, Mr.
 
 *62
 
 Clemons took off his shirt and cooked a frozen pizza for them to eat. While he was eating, Mr. Clemons was unusually quiet, and he kept looking outside. Mrs. Clemons testified that her husband told her that a man had borrowed a crowbar from him earlier that day to “pry his motorcycle from around a tree” in the area behind the Clemons’s property. (R. 391.) According to Mrs. Clemons, her husband said that the man had told him that someone had stolen his truck and had left it in the woods behind the Clemonses’ house, and that the thieves had “wrapped his motorcycle around a tree,” so the man asked to borrow Mr. Clemons’s crowbar to pry his motorcycle loose. (R. 391.) Mr. Clemons was watching for the man because he expected the man to return the crowbar. Mrs. Clemons testified that it was dark by that time because the porch light by the back porch had been turned on. However, Mrs. Clemons said, beyond the back porch it was “pitch dark” because they had so many trees in the back part of their property. (R. 392.)
 

 Mrs. Clemons testified that she looked out the window toward the back of the property because her husband was standing at the window looking out. She saw what appeared to be two flashlight beams on the road she and her husband used to travel to the back of the property. Mrs. Clemons told her husband that she could see the flashlight beams and that the man was bringing the crowbar back. Mrs. Clemons said that Mr. Clemons opened the back door and looked out; however, the man never arrived with the crowbar, and her husband continued to stand at the door looking out. Mrs. Clemons testified that she begged her husband not to go outside, but to wait for the man to bring the crowbar back to him, and that if the man did not bring the crowbar back, they could buy another crowbar. However, Mrs. Clemons said that her husband was “funny about his tools” and that when she turned around after putting some items into the dishwasher, Mr. Clemons had gone outside. (R. 393.)
 

 Mrs. Clemons testified that, after her husband went outside, she looked out the back door several times but saw nothing. The last time she looked out the door, however, Mrs. Clemons saw a man, who she later positively identified both in a photographic lineup and at trial as Saunders, sitting on the back porch. Saunders was sweating profusely, and Mrs. Clemons thought that he was having some kind of attack, so she opened the door and asked him if he was all right. Saunders told her that he was having an asthma attack. Mrs. Clemons took a glass of water and a wet washcloth to Saunders, and Saunders asked Mrs. Clemons if he could use her bathroom; although she was frightened, Mrs. Clemons permitted Saunders to come into the house.
 

 Saunders went into the bathroom, and when he came out he asked Mrs. Clemons if she would telephone his mother. Mrs. Clemons said that she picked up the wall-mounted telephone to dial the number Saunders had given her and that she had dialed all but the last digit when Saunders attacked her. Mrs. Clemons testified:
 

 “So he had come up behind me and he put his arm around my neck like this and jerked my head back and told me, ‘Drop the phone.’ And I dropped the phone. And I won’t ever forget it as long as I live. I just thought I’m going to die. And I won’t get to see my family anymore. I won’t ever forget that feeling.”
 

 (R. 395.)
 

 According to Mrs. Clemons, Saunders told her that he had handcuffed Mr. Clemons to the steering wheel of the car, and that Mr. Clemons had said to tell Mrs.
 
 *63
 
 Clemons to give Saunders all the money in the house. Saunders told Mrs. Clemons that if she gave him all the money in the house, he would not hurt her or her husband. Mrs. Clemons then opened the kitchen drawer where her husband kept his wallet and she took out the three $1 bills inside and gave them to Saunders. Saunders then told her that he wanted the keys to their automobiles. Mrs. Clemons refused to give him the keys to their daughter’s Ford Mustang, but she gave him the keys to Mr. Clemons’s 1989 Lincoln. Saunders then picked up a steak knife and walked toward her. Mrs. Clemons told Saunders to put the steak knife down, to throw it behind the table, and he did so. Saunders then picked up a screwdriver and walked toward her; again, Mrs. Clemons told him to put it down, and he did so. Mrs. Clemons testified that Saunders next picked up an electrical cord and wrapped it around his hands, but that when she told him to put the cord down, he again followed her instructions. Mrs. Clemons then asked Saunders why he was doing this and told him that they had nothing. Saunders responded that he wanted money to buy crack cocaine.
 

 At this point, Mrs. Clemons realized that she knew Saunders, and she told him that she recognized him and that she knew that he lived in a nearby mobile home park. Saunders initially denied living in the area, but when Mrs. Clemons said that she knew that he lived with his mother and brother in a mobile home because she had once seen him on the back of their property with a dog, Saunders admitted that he lived in the mobile home park. Mrs. Clemons testified that Saunders then told her that before he left her house, he was going to give her his name so that she could call the police and report him because he knew that what he was doing was wrong and that he needed to be punished. Mrs. Clemons said that she then asked Saunders why he would not let her and her husband go, and why he was doing this to them. Saunders told Mrs. Clemons that he wanted to be like them, and that he had been watching the Clemonses for more than two months.
 

 Mrs. Clemons testified that Saunders then put his arm around her neck and she “started making a noise.” (R. 400.) Saunders put his hand over her nose and mouth, jerked her head back, and repeatedly told her to shut up. Saunders then struck Mrs. Clemons in the face with his fist and knocked her onto the hardwood floor. Mrs. Clemons testified that she remembered her “head bouncing off the floor” when she landed. (R. 400.) Mrs. Clemons then got up and Saunders again placed his arm around her neck, and dragged her into various rooms of the house, looking for items of value. At one point as Saunders was dragging Mrs. Clemons around the house, Mrs. Clemons told Saunders to get his arm away from her neck and he did. When Saunders turned away from Mrs. Clemons, she ran out the front door and screamed for her husband. When Mr. Clemons did not answer, she screamed for her neighbor. Saunders then came outside, grabbed her, and told her to shut up. Mrs. Clemons testified that she could not be quiet, so Saunders struck her again with his fist and knocked her to the ground, causing her glasses to fall off.'
 
 [4]
 
 When she got up, Mrs. Clemons said, Saunders put his arm around her neck again and dragged her back into the house.
 

 Mrs. Clemons testified that after Saunders brought her back into the house, he asked her to pour him a glass of milk. After she poured him the milk and he
 
 *64
 
 drank some of it, he took her to the dining room, where he smoked crack cocaine. They then returned to the kitchen where he sprayed the glass he had used with Windex brand glass cleaner. Mrs. Clemons testified that she did not know what other surfaces Saunders sprayed with the Windex cleaner, but that Saunders had been very careful not to touch items in the house and that he had made her pick everything up for him. Saunders then dragged Mrs. Clemons to one of the bedrooms in the house and, when he saw her purse on a bed, he told her to empty her purse and give him the money from her wallet. Mrs. Clemons complied with Saunders’s instructions and gave Saunders $57 she had in her wallet. When Saunders saw a bag of Mrs. Clemons’s prescription medication, Saunders told Mrs. Clemons to give the bag to him. According to Mrs. Clemons, Saunders then took two or three of her “water pills,” two or three of the pills prescribed for her cholesterol, and at least one of her sleeping pills. (R. 406.)
 

 Saunders then took Mrs. Clemons down the hall and into the bathroom and blocked the bathroom door with his leg so that Mrs. Clemons could not leave. He then smoked more crack cocaine. Mrs. Clemons said that Saunders then took some playing cards out of his pocket; each card contained a picture of a naked woman in a suggestive pose. Saunders told Mrs. Clemons to select one of the cards, but she refused and told Saunders that she did not “touch filth like that.” (R. 409.) Saunders told Mrs. Clemons repeatedly to draw a card and explained that the card she selected would determine how much longer he would stay in the house. Mrs. Clemons then selected a card and flipped it at Saunders’s face. Saunders looked at the card and told Mrs. Clemons that she had to pose like the woman on the card was posed. Mrs. Clemons said that she did not look at the card so she did not know how the woman on the card was posed but that she refused to pose. When Saunders continued to demand that Mrs. Clemons pose, Mrs. Clemons said: “I will fight. And if you get this Scotch Irish and Indian blood mixing together, I’m mean.” (R. 410.) Mrs. Clemons then told Saunders that she would fight him until she died; that he was not going to make her pose; and that she wanted to leave the bathroom because he was scaring her. Saunders then moved his leg and allowed her to leave the bathroom.
 

 Saunders followed Mrs. Clemons out of the bathroom, and he dropped his crack pipe and it rolled down the hallway. Saunders told Mrs. Clemons that he was going to bend over and pick up the pipe and to not “try anything stupid.” (R. 410.) Mrs. Clemons assured Saunders that she would not do anything when he leaned over. However, as soon as Saunders leaned over to pick up the pipe, Mrs. Clemons ran into one of the bedrooms, grabbed a shotgun, and said “Come on, we’re even.” (R. 411.) When Mrs. Clemons walked out of the bedroom, she saw that Saunders was going out of the back door of her house. Mrs. Clemons ran into the yard and fired the shotgun. Mrs. Clemons said that she could not see where Saunders had gone when he left the house and that she was afraid that “he might double around and come back and finish me” (R. 411), so she ran back into the house, locked the door, and telephoned emergency 911. Testimony indicated that Mrs. Clemons’s call was received by the emergency-911 dispatcher at
 
 9:58
 
 p.m. The 911 call was played for the jury at trial.
 

 When the police arrived, Mrs. Clemons walked through the house with them and told them every detail about the ordeal that she could recall. Mrs. Clemons told the police officers that she did not know the intruder’s name, but she told them to contact her neighbor across the street be
 
 *65
 
 cause she had contacted that neighbor when she had previously seen Saunders on the back of her property with the dog, and the neighbor had indicated that she knew Saunders. Mrs. Clemons testified that she sustained numerous injuries as a result of Saunders’s attack. She said that her lungs had contusions and were full of blood, that some of her ribs were fractured, and that she had suffered bruises to her face, head, and neck. Mrs. Clemons was hospitalized for several days as a result of the injuries Saunders inflicted. Photographs taken of Mrs. Clemons at the hospital the day after the attack depicted extensive bruising on Mrs. Clemons’s face, chest, and abdomen. James Baggett, the physician who treated Mrs. Clemons at the hospital, testified that Mrs. Clemons appeared to have suffered a concussion that resulted in a loss of hearing; that many parts of her body were bruised; that she developed severe black eyes and her eyes were nearly swollen shut by the second day she was in the hospital; that an examination of her abdomen indicated that she had received a blow to the mid-stomach area; that the tissues in her chest that hold the heart in an upright position, the medastinum, were swollen and probably had blood mixed in with the fluid, which indicated that she had suffered a fairly severe blow to her chest; that bruises and swelling on the left side of her neck and shoulder were consistent with trauma and indicated that some pressure was applied to that area of her body; and that she had pulmonary contusions on both lungs that impaired the flow of oxygen and that probably resulted from blunt-force trauma to the chest. In addition, Dr. Baggett testified that on the afternoon of July 10, 2004, the day after the attack, Mrs. Clemons went into heart failure, most likely as a result of decreased oxygen supply to the heart; that she was placed in the hospital’s intensive-care unit; and that the problem took several days to resolve.
 

 Terry Fent, a police officer with the Foley Police Department, testified that he and two other officers were dispatched to the Clemonses’ residence in response to Mrs. Clemons’s emergency call. After conducting a protective sweep of the house, the officers spoke with Mrs. Clemons. Mrs. Clemons told the officers that her husband was handcuffed in a car or truck in the backyard. She described her attacker as a slender, tall, white male with light-colored hair; she said he was wearing yellow shorts but no shirt. Mrs. Clemons also told the officers that she thought she had seen the man before and that he might be a neighbor. Dempsey Hunt, an officer with the K-9 unit of the Foley Police Department, testified that he was also called to the Clemonses’ residence on the night of July 9, 2004. Officer Hunt testified that he had been told that the suspect fled from the house through the back door, so he took his tracking dog to the back door, but the dog did not pick up a scent. As Officer Hunt and another officer walked in the backyard, however, they noticed a flashlight on the ground near a truck. Officer Hunt then commanded his dog to track from the flashlight, and the dog walked toward the hedgerow at the edge of the Clemonses’ property. At approximately the same time, Stephen Smith, a corporal with the Foley Police Department, positioned his police cruiser in the yard so that its headlights illuminated some of the backyard. The officers then saw Mr. Clemons’s body approximately 50 to 75 yards from the residence, near a hedgerow that separated the Clemonses’ property from a mobile home park. Mr. Clemons appeared to have sustained severe head wounds and was dead when the officers found him. One of the pockets on Mr. Clemons’s pants was turned inside out and there appeared to be an area of blood on the pocket. An opened knife sheath
 
 *66
 
 was on Mr. Clemons’s belt, and a folded or unopened knife was found under Mr. Clemons’s body. In addition, a crowbar with what appeared to be blood, tissue, and hair on it was found on the back patio, leaning against the Clemonses’ house.
 

 After discovering Mr. Clemons’s body, the officers and the tracking dog walked through the hedgerow where Mr. Clemons’s body was found and continued to track the suspect. The dog led the officers to a mobile home located near the back of the Clemonses’ property. The police officers spoke to the people in the mobile home — Saunders’s mother and his younger brother, L.B. Saunders (“L.B.”)— but neither revealed any information useful to the police officers, and the dog did not pick up any tracks in the area. As officers were returning to the Clemonses’ house, however, they received information that Mrs. Clemons, who was then in the emei’gency room, had told Tony Fuqua, a sergeant with the Foley Police Department, that she believed that her attacker might have been a neighbor. Upon learning this information, the officers returned to the Saunderses’ mobile home on the adjacent property. When . the officers spoke to Saunders’s mother a second time, she told them that another of her sons also lived in the mobile home, but that he had left between 5:00 p.m. and 7:00 p.m. that evening. She allowed the officers to look inside the mobile home, but L.B.’s girlfriend was the only other person inside. L.B. told the police that two friends, Eric Bright and Melissa Dallas, had visited him at the mobile home earlier that evening and that they had left approximately 45 minutes earlier, around the time the police had received the emergency call from Mrs. Clemons.
 

 Bright and Dallas both testified at trial that they knew Saunders, and Bright testified that he had worked with Saunders. Bright and Dallas were at the Saunderses’ mobile home visiting L.B. during the evening hours of July 9, 2004, when someone knocked on the door and L.B. went outside briefly. Dallas testified that when L.B. came back inside, he told them to leave, so she and Bright went outside, where they saw Saunders, who was wearing shorts and no shirt. Bright and Dallas both testified that Saunders was out of breath, and Dallas said that Saunders was sweating and looked like he had been running or jogging. Saunders asked Bright for a ride as the couple was preparing to leave; he told Dallas and Bright that he had gotten into an argument and wanted a ride to a friend’s house in Gulf Shores. Bright agreed to give Saunders a ride to Gulf Shores, but while they were still in the Foley area, Saunders told Bright to slow down, and he jumped out of the back of Bright’s truck.
 

 Kye Belser, an officer with the Foley Police Department testified that on July 10, 2004, he received information that Saunders might be at a mobile home on North River Road in Foley. He and another Foley police officer, Officer Randolph Stallworth, drove their patrol cars to that residence; Officer Belser went to the front door of the residence, and Officer Stallworth went to the back door. As they knocked on the doors, Officer Belser heard Officer Stallworth say something like, “coming your way,” so Officer Belser stepped off the porch to look for something that might be coming around the mobile home. (R. 674.) Officer Belser saw Officer Stallworth walking toward the front of the mobile home with Matthew Saunders, another of Saunders’s brothers. Matthew told the officers that Saunders was under the mobile home. Officer Belser could not see under the mobile home because it was dark, but he told the person that if he did not come out, a police dog would be sent to get him. Saunders then came out from
 
 *67
 
 under the mobile home and was taken into custody.
 

 David White, a lieutenant with the Foley Police Department, and Sgt. Fuqua interviewed Saunders at the Foley Police Department. Saunders told the officers that he had been smoking crack cocaine for two or three weeks and that he was dependent on the drug. He initially told the officers that Mr. Clemons had previously purchased crack cocaine from him and that Mr. Clemons had attempted to purchase more crack cocaine from him on July 9, 2004, but that he did not have money to pay for the drug, so he and Mr. Clemons argued and he then punched Mr. Clemons. However, Sgt. Fuqua told Saunders that he knew that Saunders was lying because he had known Mr. Clemons for years and knew that Mr. Clemons was a religious man who did not smoke crack cocaine. Sgt. Fuqua testified that Saunders then broke down in tears, expressed remorse, and agreed to tell them the truth. However, Saunders said that he would only speak with Sgt. Fuqua, and the remainder of the interview continued without Lt. White.
 

 Saunders told Sgt. Fuqua that he had purchased crack cocaine twice on July 9; the first time he purchased and smoked $50 worth of the drug, the second time he purchased $100 worth of the drug. Saunders said that he went onto the property next to his mother’s mobile home, on the other side of a hedgerow, to smoke the last of his crack cocaine because he was ashamed of smoking crack, and he did not want to be near his mother’s mobile home when he was ingesting the drug. Saunders said that Mr. Clemons saw him and asked him what he was doing there, and that he told Mr. Clemons that he was getting high; Mr. Clemons then yelled at him and told him to get off the property. Saunders told Sgt. Fuqua that as Mr. Clemons turned to leave, Saunders heard him say something about calling the police; that he became infuriated; and that he then picked up the crowbar and hit Mr. Clemons on the head several times. Saunders said that he was not sure, but that he believed Mr. Clemons was dead. Saunders acknowledged that he had borrowed the crowbar from Mr. Clemons earlier that day.
 

 Saunders told Sgt. Fuqua that after he hit Mr. Clemons, he wandered around to clear his head, and then decided to approach the Clemonses’ house to try to take any valuables so that he could buy more crack cocaine. He admitted that he feigned an asthma attack and that Mrs. Clemons then let him inside the house. Saunders said that he became angry when Mrs. Clemons tried to call for help, and he grabbed her from behind. Saunders also said that he smoked crack cocaine in the house several times and that Mrs. Clemons had poured a glass of milk for him; according to Saunders, milk helped calm him when he smoked crack cocaine. Sgt. Fu-qua asked Saunders about the Windex brand glass cleaner, and Saunders told him that he had used the Windex to wipe down every place he touched to try to destroy fingerprint evidence. Saunders told Sgt. Fuqua that he did not intend to kill or to rape Mrs. Clemons and that he took Mrs. Clemons to a back bedroom so that he could shut the door and escape. Saunders said that after he ran out the back door of the house, he heard a gunshot and he went to his mother’s mobile home. Saunders admitted that he later left the area with Bright and Dallas. .
 

 Scott Black testified that he was near Underwood Road between 10:00 or 10:30 p.m. on July 9, 2004. Black testified that, as he backed his vehicle into a friend’s driveway, his headlights were shining onto Underwood Road. Black said that he heard a gunshot, and that he then saw a man
 
 *68
 
 walking quickly and looking behind him. According to Black, the man was wearing yellow shorts and tennis shoes, but no shirt.
 

 Michael Norris, Jr., testified that he lived with his mother, his stepfather, and Saunders’s brother, Matthew, in the mobile home where Saunders was arrested. Norris said that he grew up with Matthew, and that he had known Saunders for a long time. Norris stated that on the night of July 9, 2004, he was in the garage with his uncle and Matthew when Saunders walked up to them and said that someone had dropped him off behind the mobile home and that he wanted to talk to Matthew. Norris said that he did not initially recognize Saunders when he walked up “because [Saunders] had red stains all over him” (R. 759), and that the red stains made him suspicious so he listened to Saunders while he talked to Matthew. Norris said that he overheard Saunders tell Matthew that he had hit someone on the head with a crowbar and that he thought he had killed the person. Norris testified that he told his mother that she should not let Saunders spend the night with them, but that Saunders told Norris’s mother only that he had fought with someone, and she allowed Saunders to spend the night at their residence. Saunders changed clothes in Norris’s room and left the clothing in that room. The following morning, a police officer went to the residence and recovered the yellow shorts Saunders had been wearing the night of the crime. DNA testing revealed that Mr. Clemons’s blood was on Saunders’s yellow shorts, as well as on the crowbar that was found on the Clemonses’ back patio, and that Saunders’s own blood was also on the yellow shorts. In addition, the parties stipulated that DNA testing revealed that Mrs. Clemons’s blood was found on a telephone handset in the Clemonses’ residence.
 

 The Clemonses’ house and the outbuildings on the property were photographed, the interior of the house was diagramed and videotaped, and numerous items of evidence were seized from the property. The photographs, videotape, and physical evidence corroborated Mrs. Clemons’s testimony regarding the actions Saunders took while he was in the house with her. For example, the police photographed and recovered the steak knife, screwdriver, and extension cord that Mrs. Clemons testified Saunders had picked up and that she had ordered him to put down. The officers also found the glass of milk Saunders had told Mrs. Clemons to prepare for him and the bottle of Windex brand glass cleaner Saunders had used to spray the glass after he drank from it. In addition, the police documented that the contents of Mrs. Clemons’s purse had been emptied onto a bed, and a search of the area near the Clemonses’ house revealed two sets of keys and several playing cards with nude women portrayed on them.
 

 Kathleen Enstice, a forensic pathologist employed as a medical examiner with the Alabama Department of Forensic Sciences in July 2004, testified that she performed the autopsy on Mr. Clemons. Dr. Enstice testified that Mr. Clemons was 5 feet, 7 inches tall and that he weighed 139 pounds. No drugs or alcohol were found in Mr. Clemons’s blood or urine. Dr. Ens-tice’s examination of Mr. Clemons’s body revealed that he had sustained three categories of injuries: blunt trauma to the head and neck; compression of the neck, or strangulation; and blunt-force trauma to the torso. Dr. Enstice explained:
 

 “The first [category] I called blunt trauma of the head and neck, which included multiple-patterned' blunt force injuries to the scalp, which I labeled A through
 
 *69
 
 F. It’s an arbitrary labeling, not to say one came first or last.
 

 “Depressed comminuted, which are multiple fragmentation and displaced fracturing of the skull. Multiple lacerations, laceration is a tear, of the dura mater which surrounds the brain. Traumatic disruption. Hemorrhages, contusions, which are bruises, and swelling of the brain. I then appended a separate brain report where I’m just — -where I do describe the specific injuries of Mr. Clemons’ brain.
 

 “The next under the head and neck injury, again, multiple subgaleal contusions of the head. These are deep, deep contusions beneath the scalp that you can see on the surface of the skull.
 

 “Diffused hemorrhage in subcutaneous tissues, that’s underneath the skin; muscles; facial, which is just a dividing plain; and ligaments of the posterior base or back of the head and the back of the neck, posterior neck; multiple contusions, again, those are bruises; abrasions, which are scrapes or scratches; and lacerations, which are tea[rs] of the skin.
 

 “The second listing I put under the final diagnosis, compression of neck. Underneath that, I put hemorrhage in the deep muscles and the soft tissues adjacent to the larynx, which is the area you can feel in the front of your neck, kind of where the Adam’s Apple region is and where the vocal cords are. Multiple bilateral, both right and left.
 

 “Scleral and conjunctival petechial hemorrhages. Scleral hemorrhages are in the white part of the eyes. Conjunctival hemorrhages are inside the upper and lower eyelids. Multiple petechial hemorrhages of the upper and lower buccal mucosa, and that is basically the inside of the lips, upper and lower inside of the lips. And petechia of the skin surrounding the left eye.
 

 “The next listing under compression of the neck was contusions, again, bruises and abrasions which are scratches of the skin of the neck.
 

 “The next category I broke down was blunt trauma of the torso, and under that, contusions of the skin; in other words, bruising of the skin. The next category, blunt trauma of the left upper extremity, which was contusions of the left wrist; in other words, a bruise of the left wrist.”
 

 (R. 614-16.) Dr. Enstice determined that the manner of Mr. Clemons’s death was homicide and that the cause of his death was blunt-force trauma to the head.
 

 Dr. Enstice testified that she found numerous bruises, scrapes, and tears on Mr. Clemons’s face. Dr. Enstice noted a large area of bruising on the left side of Mr. Clemons’s face, in front of his left ear; the skin of his left upper eyelid was torn and surrounded by a bruise; a number of small bruises were noted on the left side of his forehead; a prominent bruise with swelling was noted around his right eye, and that area included small tears in the skin; bruises were noted on Mr. Clemons’s mouth, nose, and left jawline; the top of Mr. Clemons’s nose was bruised and scraped; and the inside of Mr. Clemons’s lower lip was bruised, scratched, and torn. Dr. Enstice testified that, in her opinion, the injuries to Mr. Clemons’s eyes and nose were caused by direct blows to his face. Dr. Enstice also testified that the injuries were inflicted while Mr. Clemons was alive, and that they would have been painful, but not fatal.
 

 Dr. Enstice also testified that Mr. Clemons sustained six blunt-force injuries to his head. One of the injuries tore the cartilage of Mr. Clemons’s right ear and caused a large purple bruise that extended onto
 
 *70
 
 the skin in front of his ear. Dr. Enstice testified that brain tissue could be seen inside Mr. Clemons’s right ear canal, which indicated that the bony ear canal had been fractured. Another injury was a gaping wound behind Mr. Clemons’s right ear; that injury caused skull fractures beneath the tear in the skin and Dr. Enstice testified that she could see brain material and blood inside Mr. Clemons’s head from that open wound. Other injuries tore through the skin on Mr. Clemons’s head and caused bruising. The final blunt-force head injury that Dr. Enstice noted was very close to the top of Mr. Clemons’s head; the skin was torn, and his skull was exposed.
 

 Dr. Enstice testified that Mr. Clemons also sustained injuries to his neck, including bruises on the surface of the skin and bruises deep inside the neck. Dr. Enstice removed what she described as the “deep-neck structures” from Mr. Clemons’s neck and observed a large area of hemorrhage that is usually caused by compression of the neck. (R. 632.) The injuries to the internal structures of the neck, combined with the hemorrhages in Mr. Clemons’s upper and lower inner eyelids and in the whites of his eyes, led Dr. Enstice to conclude that, in addition to being beaten, Mr. Clemons was strangled and that he was alive when he was strangled. She stated, however, that if a ligature or a rope were used in the strangulation, she would have expected to see a pattern on the external surface of the skin or in the muscles of the neck, but that she observed no such pattern, and that Mr. Clemons’s neck had linear scratches which could have been caused by fingernails during manual strangulation. Dr. Enstice testified that the strangulation was only partial and that, although it was painful and might have contributed to Mr. Clemons’s death, the strangulation did not cause his death.
 

 Finally, Dr. Enstice testified that Mr. Clemons was struck on his back near the time of his death and that the injury caused a prominent bruise. Dr. Enstice testified that the injury to Mr. Clemons’s back was likely caused by a blow from behind.
 

 Dr. Enstice examined and measured the crowbar that the police found propped against the Clemonses’ house near the back door. Dr. Enstice determined that the blunt-force injuries to Mr. Clemons’s head were consistent with the crowbar. She stated that the six blows to Mr. Clemons’s head were delivered with tremendous force because the skull was fractured “pretty much everywhere except for over the left eye.” (R. 644.) Dr. Enstice testified that the blow to the right side of Mr. Clemons’s head that tore his ear and fractured his skull also severely injured the brain and would have been fatal. Dr. Ens-tice testified that the blow to the top of Mr. Clemons’s head would have incapacitated him and also would have been fatal because it caused severe fractures to the base of Mr. Clemons’s skull. According to Dr. Enstice, these injuries to the top of the head and to the right side of the head by the ear were so severe that Mr. Clemons’s death would have followed either one of these injuries in less than a minute, and closer to seconds. However, the blood-spatter pattern from the blow to the top of Mr. Clemons’s head flowed downward, indicating that Mr. Clemons was in an upright position when he was struck on top of the head, but the rest of the blood from his head wounds drained toward his face, which, Dr. Enstice testified, was consistent with him being facedown on the grass when the other blows to the head were struck. Dr. Enstice also testified that the wounds to Mr. Clemons’s face could not have been inflicted after he fell to the ground from the blow to the top of his head; therefore, Dr. Enstice testified, the
 
 *71
 
 injuries to Mr. Clemons’s face had to have been inflicted before the fatal blows were struck.
 

 Saunders testified in his own defense. Saunders acknowledged that he smoked crack cocaine and testified that he had purchased crack cocaine twice on the day he killed Mr. Clemons. He stated that, although he had never directly spoken with Mr. or Mrs. Clemons, he had previously been to the Clemonses’ residence with his mother to get some peaches. Saunders testified that, the day of the murder, he had borrowed a crowbar from Mr. Clemons to work on a “clubhouse” he was building “as a place for me to go and smoke my crack and for neighborhood children around there.” (R. 915.) However, Saunders admitted that he knew that by borrowing the crowbar, he would “have a reason to be around the property.” (R. 983.) Saunders claimed that he and his family had planned to move away from the area on July 10, 2004, the day after he borrowed the crowbar and killed Mr. Clemons.
 

 Saunders testified that on the night of the murder, he was going to take the crowbar back to Mr. Clemons when he stopped on the Clemonses’ property to smoke crack. Mr. Clemons walked up to him and asked him what he was doing, and Saunders told him that he was “getting high.” (R. 920.) Mr. Clemons told Saunders to leave his property and then turned and walked away. Saunders testified that he “heard [Mr. Clemons] say something about the law or police maybe. And I had gotten scared at that point, and I hit Mr. Clemons in the back of the head with the crowbar.” (R. 920.) Saunders testified that he did not remember strangling or choking Mr. Clemons, nor did he remember going through Mr. Clemons’s pockets. He said he might have done so, but he could not recall because he was high on crack. Saunders also testified that he could not remember how many times he hit Mr. Clemons with the crowbar. Saunders testified that he did not know why he went to the Clemonses’ house after he hit Mr. Clemons, but that “[m]aybe I was thinking for more money.” (R. 923.)
 

 Saunders admitted that he had feigned an asthma attack in order to gain entry into the house and that he grabbed Mrs. Clemons around the neck and led her from room to room. When asked what he was thinking about when he dragged Mrs. Clemons through all the rooms in the house, Saunders replied that “[apparently it was for money.” (R. 971.) Saunders admitted that while he was inside the Clemonses’ house he took money from Mrs. Clemons’s purse and from Mr. Clemons’s wallet. Saunders remembered that Mrs. Clemons escaped and ran outside, and he remembered knocking her to the ground. He said that he did not remember dragging Mrs. Clemons back into the house, but that he recalled Mrs. Clemons being back inside the house and asking him to telephone emergency 911 because she was having chest pains. Saunders also testified that he remembered spraying Windex brand glass cleaner on the telephone in the kitchen and said that he “must have been spraying it to get rid of a fingerprint on the phone.” (R. 969.) Saunders acknowledged that he smoked crack cocaine while he was inside the house and that he showed Mrs. Clemons the playing cards with the naked women on them. Saunders testified that he might have told Mrs. Clemons that he was going to make her pose like the women on the cards, but that he could not recall. Saunders testified that he took Mrs. Clemons to a back room; that he hit her, causing her to fall down; that he walked toward the back door to leave the house; that when he got to the back door, he saw that Mrs. Clemons was pointing a shotgun at him;
 
 *72
 
 and that Mrs. Clemons fired a shot after he was outside.
 

 Saunders testified that after he left the Clemonses’ residence he returned to his mother’s mobile home, spoke to his brother, L.B., and then asked Eric Bright for a ride. Saunders said he went to the place where his younger brother, Matthew, was staying, and that he told Matthew that he had “screwed up,” but that he could not remember what else he told his brother. (R. 933.) Saunders said that he then ingested drugs and alcohol and “drifted off to sleep” until Matthew woke him up the next morning and told him that a police officer was outside. (R. 934.) Saunders admitted that he ran outside and hid beneath the mobile home because he knew that he had done something wrong the night before.
 

 At the penalty phase of the trial, Saunders presented evidence regarding his childhood, his mental health, and his prison record. Marie Saunders Young, Saunders’s older sister, testified about the members of the Saunders family and about their chaotic upbringing. Young testified that when she and her five brothers were growing up, the family moved frequently and lived in several small houses, a hotel, small mobile homes, and an abandoned building. They were often evicted for failing to pay the rent, and they often did not have electricity or running water in the places they lived. Young stated that their parents were violent toward each other and that they drank alcohol to excess. Young said that it was she, not her parents, who took care of the house and her brothers, and who made sure the boys went to school, had clean clothes, did their homework, and completed the chores she had assigned to them. According to Young, their mother hit all the children with mop and broom handles and other objects as corporal punishment. Young said that, although she graduated from high school, Saunders quit school in the middle of the sixth grade, when he was 13 or 14 years old. Young testified that she and her husband had let Saunders live with them for awhile at one point; that her husband taught Saunders carpentry; and that Saunders worked with her husband. However, Young testified that Saunders “was doing a long list of drugs” and drank alcohol. (R. 1151.) She also testified that Saunders had attempted suicide; according to Young, Saunders once attempted to shoot himself in the head with a nail gun, but failed because someone had unplugged the gun.
 

 Joanne Terrell, a certified clinical social worker, completed a psychosocial assessment of Saunders. Terrell testified that the focus of a psychosocial assessment is on a variety of environmental factors, including the person’s childhood, adolescence, family history, school and work history, drug and alcohol problems, family relationships, and psychiatric problems. Terrell testified about the details she learned about Saunders’s upbringing, which she described as “disastrous” (R. 1258), and concluded, among other things, that Saunders grew up in a neglectful, abusive, and dangerous environment; that he witnessed domestic violence and was a victim of violence in his home; that Saunders lived in an impoverished and “gypsy-type environment” (R. 1261); that he became anxious and depressed and had learned to deal with his feelings by ingesting drugs and alcohol and that he developed a significant dependency on drugs and alcohol; and that on the night of the crimes for which Saunders was convicted in this case, his acute drug and alcohol intoxication, combined with what Terrell believed to be Saunders’s psychological disorder, had resulted in Saunders’s having a diminished capacity to appreciate his actions. On cross-examination, however,
 
 *73
 
 Terrell acknowledged that Saunders had told her associate who interviewed him that he had had a good childhood, that he had all the food and clothing he needed, and that he had received gifts for birthdays and Christmases. Terrell also acknowledged that her report inaccurately stated that Saunders’s parents had divorced when he was 10 or 11 years old, when, in fact, they had divorced when Saunders was approximately 6 years old. Therefore, Terrell admitted, Saunders did not observe physical violence between his parents after he was 6 years old.
 

 Stanley Brodsky, a clinical psychologist, evaluated Saunders before trial. Dr. Brodsky conducted a forensic clinical interview, reviewed available psychiatric records, and administered three psychological tests to Saunders. Dr. Brodsky found no information suggesting that when Saunders committed the crimes for which he was convicted he was unable to differentiate between right and wrong; Dr. Brodsky also found no evidence that Saunders was unaware of his actions or that he was unable to appreciate the wrongfulness of his actions. Dr. Brodsky concluded that Saunders suffered from a major depressive disorder “with mood congruent psychotic features” (R. 1196), and explained that Saunders had reportedly experienced auditory hallucinations, a voice telling him to “just go ahead and do it,” which was related to his past suicide attempts. (R. 1197.) Dr. Brodsky determined that Saunders had a history beginning in early adolescence “of a huge intensity and volume of alcohol and drug abuse, almost every imaginable, available illegal drugs and lots and lots of legal drugs that he used as well as large amounts of alcohol,” which led Dr. Brodsky to diagnose Saunders as suffering from polysubstance dependency. Dr. Brodsky also concluded that Saunders could control himself, but that he had a diminished capacity to control himself when he committed the crimes, and that the diminished capacity was the result of his psychological disorder and the drugs he had ingested.
 

 Calvin Means, Jr., classification officer at Baldwin County Correctional Facility, testified that Saunders was in the “high max” classification at the facility (R. 1176), but that, during the 13 or 14 months that Saunders had been at the facility, he had received no disciplinary citations.
 

 After the jury unanimously recommended that Saunders be sentenced to death, Saunders sent three letters to the trial court, which the court included in the record as court’s exhibits. In one letter, Saunders merely asked to speak privately with the judge. However, in the other two letters, Saunders asked the judge to impose the death sentence as the jury had recommended. Specifically, Saunders wrote that he had done the right thing by admitting to the crime because it had cleared his conscience and that he knew that he had “really messed up” and that he deserved “the max.” (Ex. 232.)
 
 [5]
 

 On appeal, Saunders raises 17 issues, many of which he did not raise by objection in the trial court.
 
 [6]
 
 Because
 
 *74
 
 Saunders was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992);
 
 Kuenzel v. State,
 
 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
 

 Rule 45A, Ala.R.App.P., provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 “Plain error” has been defined as error “ ‘so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ ”
 
 Ex parte Womack,
 
 435 So.2d 766, 769 (Ala.1983), quoting
 
 United States v. Chaney,
 
 662 F.2d 1148, 1152 (5th Cir.1981). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”
 
 Hyde v. State,
 
 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that “ ‘[t]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ”
 
 Burton v. State,
 
 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting
 
 United States v. Young,
 
 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn
 
 United States v. Frady,
 
 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
 

 I.
 

 Saunders contends that the trial court erred in granting the State’s challenges for cause as to several jurors. (Issue XVI in Saunders’s brief.)
 

 Saunders’s entire argument in this regard is as follows:
 

 “Timothy Saunders contends that jurors were improperly excused for cause. The jurors were struck when they did not fully meet the test to be excused. The jurors were in the process of being death qualified, when they were ambivalent at first questioning, about their ability to sentence someone to death. After additional questioning, more specific in nature, these jurors indicated that they could fully comply with the law in every way. These jurors then were excused for cause, resulting in prejudice to Timothy Saunders, as an initial ambivalence is not disqualifying.
 

 “These jurors did pass the test as stated in
 
 Witherspoon v. Illinois,
 
 391 U.S. 510 (1968). Disqualification of these jurors, who were qualified to sit on this jury, prejudiced Timothy Saunders by striking for cause jurors who could, and said that they would, be reasonable while following the law.
 

 “The conviction is contrary to United States and Alabama law. The convictions and sentences are due to be reversed.”
 

 (Saunders’s brief at p. 77.) Saunders does not identify in his argument which venire-members he believes were erroneously struck for cause. However, in the statement of facts in his initial brief, Saunders states: “Defense Counsel objected to striking for cause jurors numbered 4, 45, and 51.... They only stated a preference not to vote for the death penalty. (R. 288, 341.)” (Saunders’s brief at p. 6.) In addi
 
 *75
 
 tion, Appendix A of Saunders’s brief contains a summary of adverse trial court rulings, where he lists page numbers 228 and 341 for his objections to the strikes of the three veniremembers. Therefore, we conclude, as did the State in its brief on appeal, that Saunders’s argument on appeal relates solely to the striking of venire-member no. 4, J.E.C.; veniremember no. 45, J.L.M.; and veniremember no. 51, J.W.C. Saunders objected to the striking of J.L.M. and J.W.C. However, he did not object to the striking of J.E.C.; therefore, we review that claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
 

 The transcript and the jury strike list indicate that not only did Saunders not object to J.E.C.’s being removed as a juror, but Saunders agreed to J.E.C.’s being removed. Specifically, the record reflects the following exchange:
 

 “[Prosecutor]: Can I just say one thing? I don’t think it will affect your consideration since we do have plenty, while the — while I don’t think he should be struck for cause, we don’t, since we have enough if the Court would like to let [J.E.C.] go, since he has relatives coming in to visit him, the State would have no objection.
 

 “[Saunders’s counsel]: Neither would the Defense, Your Honor.
 

 [[Image here]]
 

 “THE COURT: We’ll strike number [J.E.C.] by agreement. ...”
 

 (R. 342-43.) Thus, it is clear that J.E.C. was not struck for cause, as Saunders appears to argue on appeal, but was removed by agreement of the parties, and we find no error, plain or otherwise, as to this claim.
 

 With respect to the striking for cause of veniremembers J.L.M. and J.W.C., the record reflects that during questioning by defense counsel during voir dire, J.L.M. stated that he would never vote for the death penalty. Specifically, he said: “If given those two options, life without parole or death, I would universally vote against the death penalty. I don’t — I can’t support the death penalty in any case.” (R. 332.) J.L.M. stated that he understood that the death penalty was part of the criminal justice system and the laws of the State of Alabama, but he stated that he did not agree with them. J.L.M. also stated that, even if the trial judge instructed him to consider the death penalty as a sentencing option, there was no circumstance that he could think of in which he would vote to impose the death penalty. (R. 332-33.) J.W.C. stated during questioning by defense counsel that he could not consider the death penalty as a sentencing option for Saunders. J.W.C. said that he could not vote to impose the death penalty on Saunders because, he said, “he reminds me too much like a grandson or something, and I think I would have that emotion and I don’t think I could put it aside.” (R. 331.) J.W.C. also said that he could not set aside his personal feelings and follow the trial court’s instructions to consider the death penalty for Saunders.
 

 “A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See
 
 Ford v. State,
 
 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause.
 
 Baker v. State,
 
 906 So.2d 210 (Ala.Crim.App.2001).”
 

 Turner v. State,
 
 924 So.2d 737, 754 (Ala.Crim.App.2002).
 

 “The ‘original constitutional yardstick’ on this issue was described in
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under
 
 Witherspoon,
 
 before a juror could be removed for cause based on the juror’s
 
 *76
 
 views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In
 
 Wainwright v. Witt,
 
 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the venire-member’s views would ‘ “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ [Quoting
 
 Adams v. Texas,
 
 448 U.S. 38, 45 (1980).] The Supreme Court has expressly stated that juror bias does not have to be proven with ‘unmistakable clarity.’
 
 Darden v. Wainwright,
 
 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
 

 Pressley v. State,
 
 770 So.2d 115, 127 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000). See also
 
 Uttecht v. Brown,
 
 551 U.S. 1, 9, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) (“[A] juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible.”).
 

 A review of the voir dire examination of J.L.M. and J.W.C. clearly demonstrates that each veniremember unequivocally stated that he would not be able to consider or vote for the death penalty in this case and that he could not set aside his personal beliefs and follow the trial court’s instructions as to the sentencing options. Clearly, J.L.M.’s and J.W.C.’s views on the death penalty would have substantially impaired the performance of their duties as jurors. The trial court did not abuse its discretion when it granted the State’s challenges for cause as to J.L.M. and J.W.C.
 

 II.
 

 Saunders contends that the jury that tried his case was improperly selected. (Issue I in Saunders’s brief.) Specifically, he argues that the trial court did not comply with the procedure outlined in Rule 18.4(f), Ala. R.Crim. P., which provides that the prosecutor and defense counsel shall alternate striking names from the list of veniremembers until only 12 names remain on the list. Instead, Saunders argues, “[j]urors were struck by agreement or as a result of negotiation.” (Saunders’s brief at p. 57.) Saunders did not object in the trial court on the ground that the procedure set forth in Rule 18.4(f), Ala. R.Crim.P., was not followed during the selection of the jury; therefore, our review of this issue is for plain error. See Rule 45A, Ala.R.App.P.
 

 The record reflects that voir dire examination of the prospective jurors was conducted in panels during a two-day period beginning on August 22, 2005, and ending on August 23, 2005. The trial court asked general questions of each panel of veniremembers and the parties were permitted to ask voir dire questions of each panel thereafter. Individual voir dire questioning of some of the veniremembers on each panel then followed the group questioning. After each panel was questioned, the trial court then considered and ruled on the parties’ challenges for cause. The parties sometimes agreed on the challenges for cause, or stated that they had no objection to the challenges made by the other party. Forty-four veniremembers remained after voir dire examination was conducted and challenges for cause were made. At the end of the second day of the
 
 *77
 
 jury-selection process, the trial court recessed for the day, instructing the attorneys to be back at 8:30 a.m. the next morning to strike the jury. However, the striking of the jury is not transcribed in the record. Rather, the transcript resumes the following day, August 24, 2005, at approximately 9:11 a.m., just before the jury was brought in the courtroom and sworn. At that time, Saunders made motions unrelated to this issue, and the trial court considered the motions.
 

 “ ‘It is the appellant’s duty to provide this Court with a complete record on appeal.’
 
 Knight v. State,
 
 621 So.2d 394, 395 (Ala.Crim.App.1993). ‘ “Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.” ’
 
 Owens v. State,
 
 597 So.2d 734, 736 (Ala.Crim.App.1992), quoting
 
 Jolly v. State,
 
 405 So.2d 76, 77 (Ala.Crim.App.1981). ‘This court will not presume error from a silent record.’
 
 Frazier v. State,
 
 758 So.2d 577, 600 (Ala.Crim.App.), aff'd, 758 So.2d 611 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000). See also
 
 Roberts v. State,
 
 627 So.2d 1114, 1116 (Ala.Crim.App.1993).”
 

 Johnson v. State,
 
 823 So.2d 1, 18 (Ala.Crim.App.2001). “The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.”
 
 Ex parte Watkins,
 
 509 So.2d 1074, 1077 (Ala.1987).
 

 Saunders’s argument to this Court that the jury was selected in violation of Rule 18.4(f), Ala.R.Crim.P., is not supported by the record. Furthermore, although the striking of the jury is not transcribed in the record, the jury strike list is included in the record, and it indicates that the prosecutor and Saunders selected the jury using the striking process set forth in Rule 18.4(f), alternately striking names of veniremembers until only the names of the jurors and the alternate jurors remained. Because nothing in the record reflects that the jury striking procedure was conducted in violation of Rule 18.4(f), Saunders’s argument in this regard is meritless. Therefore, we find no error, plain or otherwise, as to this claim.
 

 III.
 

 Saunders contends that the trial court erred in denying his motion made pursuant to
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Issue II in Saunders’s brief.) Specifically, Saunders argues that the prosecutor struck veniremember no. 8, A.A., and veniremember no. 238, E.W., solely on the basis of race, and that the trial court erred when it found that he had failed to make out a prima facie case of racial discrimination. Saunders further argues that nearly all of the factors set forth in
 
 Ex parte Branch,
 
 526 So.2d 609, 622-23 (Ala.1987), indicating racial discrimination were present in his case.
 

 The record reveals that the following occurred after the jury was selected:
 

 “[Saunders’s counsel]: Yes, Your Honor, as to the State’s striking Juror No. 8, [A.A.]. She was the black female. The State had also struck No. 238 [E.W.]. Those are the only two black women that were on the jury voir dire selection list after, by agreement, we had let the other one go yesterday. It’s not a fair representation of the community. The State has not cited any race-neutral reason for striking those two people.
 

 “THE COURT: Anything else, [Saunders’s counsel]?
 

 “[Saunders’s counsel]: As far as the venire, no.
 

 
 *78
 
 “THE COURT: The motion is denied.”
 

 (R. 351.)
 

 In
 
 Ex parte Walker,
 
 972 So.2d 737 (Ala.2007), the Alabama Supreme Court recently stated:
 

 “This Court has stated:
 

 “ ‘The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider “all relevant circumstances” which could lead to an inference of discrimination/
 

 “Ex parte Branch,
 
 526 So.2d 609, 622 (Ala.1987). An objection based on numbers alone, however, does not support the finding of a prima face case of discrimination and is not sufficient to shift the burden to the other party to explain its peremptory strikes.
 
 Ex parte Trawick,
 
 698 So.2d 162 (Ala.1997).
 

 “Here, the trial court did not err in holding that Walker did not present a prima facie case of discriminatory use of peremptory strikes by the State. Walker’s objection was based totally on the number of African-Americans the State struck from the jury. When the trial court asked for facts or evidence to support the objection, Walker was unable to provide any. The trial court properly concluded that Walker had not presented a prima facie case of discriminatory use of peremptory strikes.”
 

 972 So.2d at 741-42.
 

 The circumstances before us are the same as those before the Alabama Supreme Court in
 
 Ex parte Walker.
 
 Saunders’s
 
 Batson
 
 motion was based solely on the basis that two black veniremembers were struck. Because Saunders relied on numbers alone when he objected to the State’s strikes of the veniremembers, the trial court correctly denied Saunders’s
 
 Batson
 
 motion because Saunders failed to establish a prima facie case of discrimination.
 

 Saunders also argues for the first time on appeal that he established a prima facie case of discrimination because almost all of the factors listed in
 
 Ex parte Branch,
 
 526 So.2d 609, 622-23 (Ala.1987), were present in his case. Because Saunders did not present this argument to the trial court, we review it only for plain error. See Rule 45A, Ala.R.App.P. For an appellate court to find plain error in the
 
 Batson
 
 context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges. See, e.g.,
 
 Ex parte Walker,
 
 972 So.2d at 742, and the cases quoted therein. However, the record in this case is scant. Although the record indicates that the veniremembers completed jury questionnaires, and although this Court requested that those questionnaires be forwarded to us for review, this Court has been informed by the circuit clerk’s office that the questionnaires were destroyed after the jury was empaneled, in violation of Rule 18.2, Ala. R.Crim.P.
 
 [7]
 
 Therefore, our review of this issue is limited to the voir dire questioning by the trial court and the parties. Based on that review, however, we find no inference of purposeful discrimination by the State in the exercise of its peremptory strikes.
 

 Therefore, we find no error, plain or otherwise, in the trial court’s denial of Saunders’s
 
 Batson
 
 motion.
 

 
 *79
 
 IV.
 

 Saunders contends that the trial court erred when it denied his motion to suppress the statement he gave to the police the day he was arrested. (Issue III in Saunders’s brief.) He argues:
 

 “Timothy Saunders was intoxicated on crack cocaine and beer, had been recently arrested, was mentally ill, and his will was overborne. The reliability of the confession that he made is further discredited by the fact that the tape recording of the confession was somehow not recorded, or lost, or otherwise somehow not available. The totality of the circumstances of the taking of this confession by these police officers, who later lost, or erased, or recorded over, the tape, makes the confession unreliable.”
 

 (Saunders’s brief at p. 60.)
 

 In his pretrial motion to suppress his statement, Saunders argued that his statement was the result of an illegal arrest; that his rights pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), had not been explained to him; that he did not knowingly and intelligently waive his
 
 Miranda
 
 rights; and that the police did not have probable cause to arrest him and that he had not committed an offense prior to his arrest. (C. 35-36.) It appears that the trial court held a hearing on the motion and then denied it.
 
 [8]
 
 Saunders renewed his motion to suppress at trial, and the trial court again denied it. (R. 695.)
 

 “A confession is presumed involuntary and it is the State’s burden to prove by a preponderance of the evidence that
 
 Miranda
 
 warnings were given and that the accused voluntarily waived his
 
 Miranda
 
 rights.
 
 Coral v. State,
 
 628 So.2d 954 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994);
 
 Lewis v. State,
 
 535 So.2d 228 (Ala.Cr.App.1988). In determining whether a statement is voluntary, a reviewing court must look at the ‘totality of the circumstances’ surrounding the confession.
 
 McLeod v. State,
 
 718 So.2d 727, 729 (Ala.), on remand, 718 So.2d 731 (Ala.Cr.App.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998).”
 

 Smith v. State,
 
 795 So.2d 788, 808-09 (Ala.Crim.App.2000).
 

 Regarding intoxication and its effect on the voluntariness of a confession, this Court has stated:
 

 “In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made.
 
 Moore v. State,
 
 488 So.2d 27 (Ala.Cr.App.1986);
 
 Moore v. State,
 
 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. ‘Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.’
 
 Tice v. State,
 
 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala.1980). See also
 
 Palmer v. State,
 
 
 *80
 
 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).”
 

 Jones v. State,
 
 [Ms. CR-05-0527, Aug. 31, 2007] — So.3d -, - (Ala.Crim.App.2007), quoting
 
 Hubbard v. State,
 
 500 So.2d 1204, 1218 (Ala.Crim.App.), aff'd, 500 So.2d 1231 (Ala.1986). See also
 
 Brown v. State,
 
 821 So.2d 219, 224 (Ala.Crim.App.2000) (when a defendant alleges that his statement was involuntary because he was under the influence of drugs, ‘“it must be shown that the mind of the defendant was substantially impaired when the confession was made.’
 
 Moore v. State,
 
 488 So.2d 27, 30 (Ala.Crim.App.1986).”).
 

 Sgt. Fuqua testified that he and Lt. White began questioning Saunders together on July 10, 2004, at 9:50 a.m. at the Foley Police Department. The prosecutor offered into evidence a form signed by Saunders before he gave his statement in which Saunders acknowledged that his
 
 Miranda
 
 rights had been read to him, and that he was waiving those rights and was willing to make a statement. Sgt. Fuqua testified that he made no threats toward Saunders to make him agree to give a statement and that he made no promises to Saunders in exchange for a statement from him. Sgt. Fuqua further testified that Saunders did not appear to be impaired in any way or under the influence of drugs or alcohol at the time he gave his statements. According to Sgt. Fuqua, Saunders appeared to understand the questions he was asked and he responded appropriately to the questions. Saunders requested a break approximately 20 minutes after the interview began so that he could smoke a cigarette, and Sgt. Fuqua took Saunders outside so that he could smoke a cigarette. During that break, Sgt. Fuqua testified, he did not threaten Saunders or promise him anything in return for a statement. After the short break, Saunders told Sgt. Fuqua that he would talk about what happened at the Clemonses’ residence but only if he could speak with Sgt. Fuqua alone, without Lt. White being present. Lt. White and Sgt. Fuqua agreed that Sgt. Fuqua would continue the interview alone, and Saunders gave a detailed statement admitting his involvement in the crimes against the Clemonses. Slightly more than one hour after the interview began, Sgt. Fuqua wrote a report of the details Saunders gave him during the interview.
 

 Sgt. Fuqua testified that after Saunders confessed to the crimes, he asked Saunders to give a written statement with the details of events that had occurred on July 9, 2004, but that Saunders declined to do so. Sgt. Fuqua asked Saunders if he could tape-record the confession, and Saunders agreed to that request. Sgt. Fuqua then brought a tape recorder and an audiotape into the interview room, and he and Saunders went through the details of the interview again while the tape recorder was running. However, when Sgt. Fuqua attempted to listen to the recording two days later, he discovered that the interview with Saunders had not been recorded. Sgt. Fuqua testified that he believed that he had inadvertently hit the “play” button on the tape recorder instead of the “record” button because the tape was moving during the interview but nothing from the interview was recorded.
 

 Lt. White testified that he initially participated with Sgt. Fuqua in the interview of Saunders. Lt. White stated that he did not promise Saunders anything or threaten him to get him to make a statement. Lt. White was present when Sgt. Fuqua explained the
 
 Miranda
 
 rights to Saunders, and Lt. White stated that Saunders appeared to understand his rights. Lt. White also testified that, as a law-enforce
 
 *81
 
 ment officer, he had been around many people who were under the influence of drugs or alcohol, and that Saunders did not appear to be impaired or under the influence of alcohol or a controlled substance.
 

 Furthermore, Officer Belser, who took Saunders into custody after Saunders came out from his hiding place under a mobile home, testified that Saunders did not appear to be under the influence of alcohol or drugs at the time of arrest.
 

 Finally, during his testimony at trial, Saunders gave details about his arrest and about the statement he gave to Sgt. Fuqua at the Foley police station. In addition, Saunders testified that his mind could clear up within 10 minutes of smoking crack cocaine, depending on how much he smoked. When the prosecutor asked Saunders how clear his head was while he was in the Clemonses’ house, Saunders stated: “Truthfully, right there at the end is when it became almost clear, not clear-clear. I knew what I was doing wrong. I knew some what was going on. I knew I had done something wrong.” (R. 954.) Although Saunders testified at trial that he could not recall all the details of the crime, he nevertheless testified to many of the same details that he had given to Sgt. Fuqua in his confession, including that he had hit Mr. Clemons on the head with the crowbar; that he had feigned an asthma attack to get inside the Clemonses’ house; that he had smoked crack cocaine inside the house; that he had dragged Mrs. Clemons from room to room, struck her repeatedly, and taken money from her purse and from Mr. Clemons’s wallet; and that he had left the area by asking his brother’s friends to give him a ride.
 

 Nothing in the record before us indicates that Saunders’s statement was involuntary because he was under the influence of drugs or alcohol. To the contrary, all the testimony in the record indicates that Saunders was not under the influence of drugs or alcohol when he gave his statement. Saunders himself testified that his head cleared fairly quickly after he smoked crack cocaine, and that he was “almost clear” while he was still in the Clemonses’ residence. Although Saunders testified that he ingested more drugs and drank alcohol after he committed the crime, neither Saunders nor any other witness testified that Saunders was under the influence of drugs or alcohol or that Saunders was in any way impaired several hours later when he gave his statement. Therefore, Saunders’s statement was not due to be suppressed on the ground that Saunders was substantially impaired as a result of drug and alcohol intoxication.
 

 As for Saunders’s argument on appeal that his statement should have been suppressed because, he says, his will was overborne, we note first that Saunders did not present this specific argument in his motion to suppress; therefore, we review it only for plain error. See Rule 45A, Ala. R.App.P. In his appellate brief, Saunders does not elaborate on the bare assertion that his will was overborne or provide any facts or citations to the record in support of his claim. However, after thoroughly reviewing the record, we conclude that Saunders’s argument in this regard is unsupported. The testimony in the record establishes that Saunders was not coerced or pressured into making his statement and that no inducements were offered to Saunders for making his statement. Viewing the totality of the circumstances, we conclude that no illegal inducements were offered to Saunders in order to induce a confession, and that his will was not overborne by any promises from any of the law-enforcement officers. Therefore, Saunders’s confession was not due to be suppressed on this ground. See, e.g.,
 
 *82
 

 Brooks v. State,
 
 973 So.2d 380 (Ala.Crim.App.2007).
 

 As for Saunders’s argument on appeal that his statement should have been suppressed because, he says, he was suffering from a mental illness when he gave his statement, we note first that Saunders did not present this argument in his motion to suppress; therefore, we review it only for plain error. See Rule 45A, Ala.R.App.P. No evidence was presented at the guilt phase of the trial indicating that Saunders suffered from any type of mental illness; therefore, the record does not support Saunders’s claim that a mental illness rendered his confession involuntary.
 
 [9]
 
 Thus, Saunders’s confession was not due to be suppressed on this ground.
 

 Finally, Saunders argues that the confession was not reliable and should not have been admitted into evidence because the police did not audiotape it. To the extent Saunders is arguing that the lack of an audiotape should be considered as part of the totality of the circumstances that a court must review to determine whether a confession is admissible into evidence, we note that this specific argument was not raised in the trial court; therefore, we review it only for plain error. See Rule 45A, Ala.RApp.P. However, Saunders offers no legal support for this assertion, and we find that the absence of an audiotape of a confession is not relevant to the admissibility of that confession. Rather, the absence of an audiotape is an issue that can be presented to the jury for it to consider in determining the weight and credibility of the confession. In this case, Sgt. Fuqua testified that he had attempted to make an audiotape of Saunders’s confession when he and Saunders went through the details of the crimes for the second time but that a tape recording was not made, apparently because Sgt. Fuqua had pushed the wrong button on the tape recorder. The absence of an audiotape was an issue that Saunders could, and did, present to the jury for it to consider. Specifically, during cross-examination, Saunders questioned Sgt. Fuqua extensively about his failure to record the confession, and Sgt. Fuqua acknowledged that his testimony about the confession was based on his memory of the interview with Saunders. The absence of an audiotape did not render Saunders’s confession inadmissible; therefore, Saunders’s confession was not due to be suppressed on this ground.
 

 For all of the foregoing reasons, we conclude that the trial court committed no error, much less plain error, in admitting Saunders’s confession into evidence at trial.
 

 V.
 

 Saunders contends that the trial court erred when it permitted Officer Connie King to testify that Mrs. Clemons had identified Saunders’s picture in a photographic lineup. (Issue IV in Saunders’s brief.) Specifically, citing
 
 Thomas v. State,
 
 461 So.2d 16 (Ala.1984), he argues that Officer King’s testimony was improper hearsay testimony. The State contends, on the other hand, that Officer King’s testimony was cumulative because before Officer King testified about the lineup, Mrs. Clemons had already identified Saunders in court, and she testified
 
 *83
 
 that she had identified Saunders in a photographic lineup after the crimes were committed. Therefore, the State argues, any error in Officer King’s testimony was harmless. Because Saunders did not object to Officer King’s testimony about Mrs. Clemons’s identification of Saunders from the photographic lineup, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
 

 During direct examination by the prosecutor, Mrs. Clemons identified Saunders as the man who had committed the crimes in her house the night her husband was killed. On cross-examination by defense counsel, Mrs. Clemons also testified that she had selected Saunders’s photograph from a photographic lineup. After Mrs. Clemons’s testimony, Officer King testified that she had showed a photographic lineup to Mrs. Clemons and that Mrs. Clemons had pointed to Saunders’s photograph and identified him as the perpetrator.
 

 “The general rule is that evidence by a third party of an extrajudicial identification is admissible in rebuttal of testimony tending to impeach or discredit the identifying witness, or to rebut a charge, imputation or inference of falsity.”
 
 Aaron v. State,
 
 273 Ala. 337, 345, 139 So.2d 309, 316 (1962). In
 
 Aaron,
 
 the Alabama Supreme Court held that a third party’s testimony about the prosecutrix’s pretrial identification of the defendant was properly admitted because it was presented “in rebuttal of the inference raised on cross-examination of the prosecutrix and [the third party witness] that the identification of the appellant by the prosecutrix was manufactured.”
 
 Aaron,
 
 273 Ala. at 344, 139 So.2d at 316.
 

 Here, Officer King’s testimony was not presented as rebuttal of an inference that Mrs. Clemons’s identification of Saunders was manufactured; therefore, it was improper. However, we conclude that the error in admitting Officer King’s testimony was harmless. See, e.g.,
 
 Lewis v. State,
 
 889 So.2d 623, 666 (Ala.Crim.App.2003) (harmless-error rule applies in capital cases).
 

 In
 
 Seals v. State,
 
 282 Ala. 586, 213 So.2d 645 (1968), the victim identified Seals during her testimony on direct examination, and she testified that she had identified Seals in a live lineup at the jail. Two police officers who were present at the lineup then testified that the victim had identified Seals. The Alabama Supreme Court held that the testimony of the two officers constituted harmless error:
 

 “We are of the opinion that the testimony of a third person who heard or observed an extrajudicial identification should not be admitted except under circumstances such as were present in
 
 Aaron v. State,
 
 273 Ala. 337, 139 So.2d 309, or under unusual circumstances.
 

 “However, we are of the opinion that the admission in evidence of the testimony of [the two officers] was harmless error in view of the fact that the identification of Seals by [the victim] both in court and at the line-up was undisputed.
 
 Slaughter v. State,
 
 21 Ala.App. 211, 106 So. 891 [ (1926) ].”
 

 282 Ala. at 603-04, 213 So.2d at 662.
 

 The circumstances in this case parallel those presented in
 
 Seals.
 
 Mrs. Clemons identified Saunders in court, and she testified that she had identified Saunders in a photographic lineup. Furthermore, Saunders testified at trial and he admitted to beating Mr. Clemons with a crowbar and to beating Mrs. Clemons repeatedly after he feigned an asthma attack to gain entry into the Clemonses’ house. The identity of the assailant was never an issue in this case. Based on the facts before us, we conclude that the admission of Officer King’s testimony was, at most, harmless
 
 *84
 
 error, and certainly did not rise to the level of plain error.
 

 We note that Saunders’s reliance on
 
 Thomas v. State,
 
 461 So.2d 16 (Ala.1984), in support of his argument is misplaced because the facts in
 
 Thomas were not
 
 at all like those presented in this case. The Alabama Supreme Court in
 
 Thomas
 
 stated:
 

 “In this case, the prosecuting witness, Watson, made no in-court identification of the defendant, nor did he testify that he identified the defendant in the lineup. Thus, there was no evidence identifying the defendant as the thief at that stage of the trial. Then, the State produced the two police officers who testified ‘that Watson [the prosecuting witness] identified Thomas [the defendant] in a lineup.’ This was the equivalent of allowing the officers to testify that ‘Watson said. Thomas is the thief.’ Without question, that statement was admitted for a hearsay purpose, as evidence of ‘the truth of the matter asserted,’
 
 ie.,
 
 that Watson’s identification was the truth, and thus as substantive evidence that Thomas was the thief.
 

 “The allowance of such evidence in this case was contrary to the rule recognized in
 
 Aaron, supra,
 
 and
 
 Seals, supra,
 
 and the general rule recognized in [C.R. McCorkle, Annot.,
 
 Admissibility of evidence as to extrajudicial or pretrial identification of accused, 71
 
 A.L.R.2d 449, 486 (1960) ]:
 

 “ ‘The testimony of a third person has generally been treated as inadmissible as original or substantive evidence as to the identity of the accused as the guilty party.’ ”
 

 461 So.2d at 20-21. The Alabama Supreme Court then concluded that the third party’s testimony about the identification required a reversal of Thomas’s conviction based on those facts. However, the facts in this case are clearly distinguishable from those presented in
 
 Thomas;
 
 therefore, the holding in
 
 Thomas
 
 does not require a reversal here.
 

 VI.
 

 Saunders next contends that the trial court erred when it permitted Dr. Enstice to testify about the possible positions Mr. Clemons and Saunders might have been in when Saunders struck the blows with the crowbar. (Issue V in Saunders’s brief.) Saunders’s specific argument on this issue is set out in his brief as follows:
 

 “The Coroner in this case went beyond observations and medical opinions and testified as to the relative positions of bodies and possible scenarios of physical interactions between the victim and his attacker. The Coroner opined that the victim was, for example, laying on a soft surface of grass during part of the attack ([R.] 630), but was on his feet during that part of the attack described at ([R.] 631). She described other aspects of the attack in a number of situations. Her testimony went beyond the bounds allowed by Alabama law.
 

 “Alabama law on this point of law is in
 
 Mathis v. State,
 
 73 So. 122, 124 (Ala.App.1916) which held:
 

 T] • • • [I]t is not permissible for a witness ... to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds.f]
 

 “This testimony was not confined to angles or depths of the wounds inflicted on the body of the victim. The coroner was not allowed by law to give this testimony.”
 

 (Saunders’s brief at pp. 62-63.) Saunders did not object to this testimony at trial;
 
 *85
 
 therefore, we review this claim for plain error.
 
 [10]
 
 See Rule 45A, Ala.R.App.P.
 

 We have examined Dr. Enstice’s testimony, and we find no violation of the rule announced in
 
 Mathis v. State,
 
 15 Ala.App. 245, 73 So. 122 (1916). In
 
 Mathis,
 
 the appellant argued that the trial court had erred when it permitted the physician who had treated the victim to testify about the range of the shot allegedly fired by the appellant. The Court in
 
 Mathis
 
 held:
 

 “It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound. ... But we do not think the testimony of Dr. Flowers trenched upon the prerogative of the jury in this respect in his answer that:
 

 “ ‘It [the load] didn’t look to be shot right straight in front; it looked to be a little bit that way (indicating).’
 

 “This was merely an effort to describe the character of the wound and the range the load took.”
 

 15 Ala.App. at 248, 73 So. at 124.
 

 Here, Dr. Enstice testified that she was told that Mr. Clemons was found lying in a grassy area with no rocks or concrete present; she also testified that pieces of grass were stuck to Mr. Clemons’s face when his body arrived at the morgue. She then testified that one of the bruises Mr. Clemons sustained to his face “[was] inconsistent with [lying] down on a soft surface of grass and actually getting a bruise and scratch on the skin.” (R. 630.) Dr. Enstice stated that a small injury beneath Mr. Clemons’s nose did not appear to have been caused by lying on the soft surface, but was more consistent with a blow to the face in that region. She also testified that a larger area of bruising on the left side of Mr. Clemons’s face could have been caused by blows being struck on the right side of his head while the left side of his face was on the ground. Dr. Enstice also said that the larger area of bruising could have been caused by a direct blow to that part of Mr. Clemons’s face. Finally, Dr. Enstice testified that, in her opinion, the first blow to Mr. Clemons’s head was struck while Mr. Clemons was in an upright position — either standing or kneeling — because blood spatter traveled downward toward his feet, and that the remaining blows to the head appeared to have been delivered while Mr. Clemons was on the ground because the blood from the wounds drained toward the left side of his face, which was against the grass. At no time, however, did Dr. Ens-tice testify about the relative positions of Saunders and Mr. Clemons when Saunders struck the blows. Her testimony was limited to a description and nature of the wounds and about the position Mr. Clemons was in when he was struck, all of which was based on the evidence she observed or information she had received about the location of Mr. Clemons’s body when it was found.
 

 In
 
 Robitaille v. State,
 
 971 So.2d 43 (Ala.Crim.App.2005), the appellant argued that reversible error occurred when the medical examiner testified about the position of the victim’s body when the victim was
 
 *86
 
 stabbed. This Court found no error in the medical examiner’s testimony, stating:
 

 “We have long held:
 

 “ ‘ “In a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. ‘This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.’
 
 Mathis v. State,
 
 15 Ala.App. 245, 248, 73 So. 122, 124 (1916).
 

 “ ‘ “However, a properly qualified expert may testify to the ‘path of flight’ or trajectory of the bullet,
 
 Wilbanks v. State,
 
 42 Ala.App. 39, 151 So.2d 741, cert. denied, 275 Ala. 701, 151 So.2d 744 (1963). He may testify to the slant or angle of the gunshot wound and describe its character.
 
 Woods v. State,
 
 54 Ala.App. 591, 310 So.2d 891 (1975);
 
 Mathis v. State,
 
 supra.
 
 An expert may testify about the direction from which the bullet was fired or the blow was struck, Blackmon v. State,
 
 246 Ala. 675, 680, 22 So.2d 29 (1945),
 
 Richardson v. State,
 
 37 Ala.App. 194, 65 So.2d 715 (1953), and may state the distance between the deceased and the barrel of the weapon at the time the fatal shot was fired.
 
 Straughn v. State,
 
 270 Ala. 229, 121 So.2d 883 (1960).” “
 
 ‘Ivey v. State,
 
 369 So.2d ... 1276, 1280 (Ala.Cr.App.1979), writ denied, 369 So.2d 1281 (1979) (on rehearing). See also
 
 Raspberry v. State,
 
 615 So.2d 657 (Ala.Crim.App.1992). In this case, the coroner did not testify concerning the relative position of the parties at the time of the murder. He only discussed the angle of the victim’s wounds, testimony which is permissible.
 
 Ivey; Raspberry.’
 

 “Lane v. State,
 
 673 So.2d 825, 828-29 (Ala.Crim.App.1995). [The medical examiner] did not testify concerning the positions of both the victim and the defendant at the time that [the victim] was stabbed to death; his testimony merely acknowledged possibilities concerning [the victim’s] position.”
 

 Robitaille,
 
 971 So.2d at 60-61 (emphasis added).
 

 Therefore, we find no error, plain or otherwise, with respect to Dr. Enstice’s testimony about the character and nature of Mr. Clemons’s wounds and the position of Mr. Clemons’s body when the injuries were inflicted upon him by Saunders.
 

 VII.
 

 Saunders next contends that the trial court erred when it denied his motion in limine in which he sought to prevent the prosecutor from cross-examining him about a youthful-offender adjudication he had received in South Carolina. (Issues VII and VIII in Saunders’s brief.) Saunders argues that after the trial court denied his motion in limine,
 

 “[a]s part of his trial strategy, Defense Counsel was then required to bring up the Youthful Offender adjudication when Timothy Saunders testified in his own behalf. Denying the Motion In Limine was an error, and forced Defense Counsel to take an action prejudicial to Timothy Saunders. The Youthful Offender
 
 *87
 
 adjudication was not admissible at this trial, under Alabama law.”
 

 (Saunders’s brief at p. 65.) In his reply brief, Saunders also argues that the trial court’s denial of the motion in limine forced him to choose between testifying on his own behalf and having the youthful-offender adjudication introduced or not testifying and preventing the jury from hearing his side of the story.
 

 Before Saunders began presenting the defense case, he made a motion in limine. He informed the court that he had a youthful-offender adjudication in South Carolina and pending theft charges in that state. The prosecutor stated that, if Saunders testified and attempted to create the impression that he had never been in trouble with the law before he committed this crime, then the State should be permitted to cross-examine him about the pending charges and about the facts underlying the juvenile adjudication. The trial court denied the motion in limine and stated that the scope of the prosecutor’s cross-examination would be determined by Saunders’s testimony on direct examination. The court instructed the prosecutor to notify the court before it sought to question Saunders about those pending charges or the facts of the youthful-offender adjudication.
 
 [11]
 

 On direct examination, Saunders testified that he hid from the police when they came to his friend’s mobile home to arrest him the morning after Mr. Clemons was murdered. He explained: “From my being in trouble in the past with the law, I’m naturally scared of cops.” (R. 935.) Defense counsel then asked Saunders about his past trouble with the law, and Saunders testified that he had been charged as a youthful offender in South Carolina for stealing an automatic-teller-machine card. Saunders stated: “[I]t was me and William Watson, it was his card. It was to pay a bar tab and the bar tab went a little too high. And come to find out, the card was his grandmother’s card.” (R. 935.) On cross-examination, Saunders acknowledged that there had been times in his life when he had “done wrong stuff.” (R. 952.) The prosecutor then asked: “But it always seems someone else contributes to it. Like you were telling us, you know, the credit card, it’s just because the bar tab was too high; otherwise it was okay?” (R. 952.) Saunders replied, “It wouldn’t have been okay to take the money, no.” (R. 952.) The prosecutor asked no additional questions about the youthful-offender adjudication.
 

 Initially, we note that the trial court’s ruling on Saunders’s motion in li-mine did not preserve this issue for review. “The general rule is that an adverse ruling on a motion in limine does not preserve the issue for appellate review unless an objection is made at the time the evidence is introduced.”
 
 Moody v. State,
 
 888 So.2d 532, 582 (Ala.Crim.App.2003). “[UJnless the trial court’s ruling on the motion
 
 in limine
 
 is absolute or unconditional, the ruling does not preserve the issue for appeal.”
 
 Perry v. Brakefield,
 
 534 So.2d 602, 606 (Ala.1988). Here, the trial court’s denial of Saunders’s motion in limine was qualified. The trial court acknowledged that if Saunders testified that he had never been in trouble with the law before, then his testimony would open the door and the State would be permitted to ask Saunders questions about his pending charges and about the facts underlying his youthful-offender adjudication. Defense counsel stated that he was not going to put Saun
 
 *88
 
 ders on the stand to testify that he had not committed any criminal acts in his lifetime. (R. 904.) The trial court then stated:
 

 “I’m going to deny your motion at this time. But how far the State gets to go is going to depend on what you ask your client and what your client testifies to. So I don’t think I can make a ruling at this time, but I will instruct the State that if they decide to get into some of those pending charges in South Carolina or into the facts of the youthful offender conviction, ... that’s something we’ll discuss when we get to that point.”
 

 (R. 905-06.) Therefore, our review of this issue is for plain error, see Rule 45A, Ala.R.App.P.
 

 The trial court’s ruling on the motion in limine was correct. Although youthful-offender adjudications are generally not admissible, a defendant can open the door in his direct testimony and render a youthful-offender adjudication admissible in cross-examination or on rebuttal. See, e.g.,
 
 Williams v. State,
 
 695 So.2d 644 (Ala.Crim.App.1996) (“[T]he appellant ‘opened the door’ for the admission of his prior juvenile adjudications by denying that he had ever been involved in anything similar to the offense for which he was charged.”), and
 
 Thomas v. State,
 
 445 So.2d 992 (Ala.Crim.App.1984) (holding that although a youthful-offender adjudication may not be used to impeach credibility, when the witness opens the door by denying his criminal intent in a case, his prior youthful-offender plea of guilty to the same offense is admissible). Thus, the trial court correctly ruled that if Saunders testified that he had never been in any trouble before, then the prosecutor would be permitted to cross-examine Saunders about the prior youthful-offender adjudication.
 

 Moreover, because Saunders admitted to the prior youthful-offender adjudication in his direct testimony, any error in allowing cross-examination about the youthful-offender adjudication was clearly invited by Saunders. “ ‘Invited error has been applied to death penalty cases. “An invited error is waived, unless it rises to the level of plain error.”
 
 Ex parte Bankhead,
 
 585 So.2d 112, 126 (Ala.1991).’”
 
 Scott v. State,
 
 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting
 
 Adams v. State,
 
 955 So.2d 1037, 1050-51 (Ala.Crim.App.2003). In
 
 Phillips v. State,
 
 527 So.2d 154 (Ala.1988), the Alabama Supreme Court rejected Phillips’s argument that the trial court had erred when it permitted the prosecutor to cross-examine him about his prior convictions because the State did not have certified copies of the convictions; the Court stated:
 

 “[Respondent himself brought out the evidence of his prior convictions for theft of property on direct examination. Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. There are numerous decisions which hold that a defendant cannot predicate error upon admission of testimony that is elicited by defense counsel and is responsive to defense questions.”
 

 527 So.2d at 156.
 

 Finally, to the extent Saunders argues that the trial court’s ruling on the motion in limine improperly forced him to choose between testifying on his own behalf and having the youthful-offender adjudication introduced or not testifying and preventing the jury from hearing his side of the story and then, once he made the decision to testify, forced defense counsel to question Saunders about the youthful-offender adjudication during direct examination, we note that Saunders did not make this argument to the trial court; therefore, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P. In
 
 Ohler v. United States,
 
 
 *89
 
 529 U.S. 753, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000), Ohler had been charged with importation of marijuana and possession of marijuana with intent to distribute. The district court granted the prosecution’s motion in limine seeking to allow evidence of Ohler’s 1993 conviction for possession of methamphetamine under Rule 609(a)(1), Fed.R.Evid. Ohler testified in her own defense, and she admitted on direct examination that she had previously been convicted of felony possession of methamphetamine. Ohler was convicted of both counts as charged, and the United States Court of Appeals for the Ninth Circuit affirmed Ohler’s conviction, finding that Ohler had waived any objection to the ruling on the motion in limine by introducing the evidence of her prior conviction during her direct examination. In affirming the judgment of the circuit court of appeals, the United States Supreme Court, in a 5-4 decision, rejected Ohler’s argument “that it would be unfair to apply such a waiver rule in this situation because it compels a defendant to forgo the tactical advantage of pre-emptively introducing the conviction in order to appeal the
 
 in limine
 
 ruling.” 529 U.S. at 757, 120 S.Ct. 1851. The Court stated:
 

 “[B]oth the Government and the defendant in a criminal trial must make choices as the trial progresses. For example, the defendant must decide whether or not to take the stand in her own behalf. If she has an innocent or mitigating explanation for evidence that might otherwise incriminate, acquittal may be more likely if she takes the stand. Here, for example, Ohler testified that she had no knowledge of the marijuana discovered in the van, that the van had been taken to Mexico without her permission, and that she had gone there simply to retrieve the van. But once the defendant testifies, she is subject to cross-examination, including impeachment by prior convictions, and the decision to take the stand may prove damaging instead of helpful. A defendant has a further choice to make if she decides to testify, notwithstanding a pri- or conviction. The defendant must choose whether to introduce the conviction on direct examination and remove the sting or to take her chances with the prosecutor’s possible elicitation of the conviction on cross-examination.
 

 “The Government, too, in a case such as this, must make a choice. If the defendant testifies, it must choose whether or not to impeach her by use of her prior conviction. Here the trial judge had indicated he would allow its use, but the Government still had to consider whether its use might be deemed reversible error on appeal. This choice is often based on the Government’s appraisal of the apparent effect of the defendant’s testimony. If she has offered a plausible, innocent explanation of the evidence against her, it will be inclined to use the prior conviction; if not, it may decide not to risk possible reversal on appeal from its use.
 

 “Due to the structure of trial, the Government has one inherent advantage in these competing trial strategies. Cross-examination comes after direct examination, and therefore the Government need not make its choice until the defendant has elected whether or not to take the stand in her own behalf and after the Government has heard the defendant testify.
 

 “Ohler’s submission would deny to the Government its usual right to decide, after she testifies, whether or not to use her prior conviction against her. She seeks to short-circuit that decisional process by offering the conviction herself (and thereby removing the sting) and
 
 *90
 
 still preserve its admission as a claim of error on appeal.
 

 “But here Ohler runs into the position taken by the Court in a similar, but not identical, situation in
 
 Luce v. United States,
 
 469 U.S. 38 (1984), that ‘[a]ny possible harm flowing from a district court’s in limine ruling permitting impeachment by a prior conviction is wholly speculative.’
 
 Id.,
 
 at 41. Only when the Government exercises its option to elicit the testimony is an appellate court confronted with a case where, under the normal rules of trial, the defendant can claim the denial of a substantial right if in fact the district court’s in limine ruling proved to be erroneous. In our view, there is nothing ‘unfair,’ as Ohler puts it, about putting her to her choice in accordance with the normal rules of trial.
 

 “Finally, Ohler argues that applying this rule to her situation unconstitutionally burdens her right to testify. She relies on
 
 Rock v. Arkansas,
 
 483 U.S. 44 (1987), where we held that a prohibition of hypnotically refreshed testimony interfered with the defendant’s right to testify. But here the rule in question does not prevent Ohler from taking the stand and presenting any admissible testimony which she chooses. She is of course subject to cross-examination and subject to impeachment by the use of a prior conviction. In a sense, the use of these tactics by the Government may deter a defendant from taking the stand. But, as we said in
 
 McGautha v. California,
 
 402 U.S. 183, 215 (1971):
 

 “ ‘It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination .... It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like.... Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.’
 

 “For these reasons, we conclude that a defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error.”
 

 529 U.S. at 757-60, 120 S.Ct. 1851 (footnotes omitted).
 

 For all of the foregoing reasons, we find no error, plain or otherwise, in the trial court’s denial of Saunders’s motion in li-mine.
 

 VIII.
 

 Saunders contends that his trial counsel was ineffective. Specifically, he argues that defense counsel abandoned him when, he says, counsel asked him questions during direct examination that elicited incriminating testimony and that defense counsel abandoned him when, he says, counsel made an unreasonable decision to withdraw a request for a jury instruction on felony murder.
 
 [12]
 
 (Issues IX and X in Saunders’s brief.) These arguments were
 
 *91
 
 not raised in the trial court; therefore, we review them for plain error. See Rule 45A, Ala.R.App.P.
 

 Initially, we note that claims of ineffective assistance of counsel are not often presented for review on direct appeal because of the inherent difficulties associated with reviewing such claims on direct appeal. The United States Supreme Court in
 
 Massaro v. United States,
 
 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), explained:
 

 “In light of the way our system has developed, in most cases a [postconviction proceeding] is preferable to direct appeal for deciding claims of ineffective assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under
 
 Strickland v. Washington,
 
 466 U.S. 668 (1984), a defendant claiming ineffective counsel must show that counsel’s actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the
 
 Strickland
 
 analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel’s alternatives were even worse. See
 
 Guinan [v. United States,
 
 6 F.3d 468, 473 (7th Cir.1993) ] (Easterbrook, J., concurring) (‘No matter how odd or deficient trial counsel’s performance may seem, that lawyer may have had a reason for acting as he did .... Or it may turn out that counsel’s overall performance was sufficient despite a glaring omission ...’).... Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.”
 

 538 U.S. at 504-05, 123 S.Ct. 1690. That being said, we review each of Saunders’s claims based on the limited record before us.
 

 In
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court held:
 

 “A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
 

 466 U.S. at 687, 104 S.Ct. 2052. The United States Supreme Court further explained:
 

 “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining coun
 
 *92
 
 sel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf.
 
 Engle v. Isaac,
 
 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See
 
 Michel v. Louisiana,
 
 supra, 350 U.S. [91,] 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. Goodpaster,
 
 The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58
 
 N.Y.U.L.Rev. 299, 343 (1983).”
 

 466 U.S. at 689-90, 104 S.Ct. 2052.
 

 A.
 

 Saunders argues that during defense counsel’s direct examination of him, counsel “abandoned the defense of Timothy Saunders and cast his lot with the State Prosecutor” (Saunders’s brief at p. 67) and that trial counsel “bailed out and Timothy Saunders was left to fend for himself, with one exception. Defense Counsel practically begged for a guilty verdict, and instilled hatred in the minds of the jury.” (Saunders’s brief at p. 69.) Saunders quotes the following portions of defense counsel’s direct examination in support of his argument:
 

 “[Saunders’s counsel]: Do you realize how hard you hit [Melvin Clemons]?
 

 “[Saunders]: At the time all the—
 

 “[Saunders’s counsel]: Look, look, look at this picture. Do you see that?
 

 “[Saunders]: Yes, sir.
 

 “[Saunders’s counsel]: Do you realize how hard you hit this man?
 

 “[Saunders]: Yes, sir. I do now.
 

 “[Saunders’s counsel]: And what has he done to you, nothing?
 

 “[Saunders]: Nothing at all.”
 

 (R. 921-22.)
 

 “[Saunders’s counsel]: You took money from the wallet?
 

 “[Saunders]: Yes, sir, I did.
 

 “[Saunders’s counsel]: You took money from the purse?
 

 “[Saunders]: Yes, sir.
 

 “[Saunders’s counsel]: It wasn’t yours?
 

 “[Saunders]: No, sir, it wasn’t.
 

 “[Saunders’s counsel]: Absolutely no right to be there, did you?
 

 “[Saunders]: No, I did not.
 

 “[Saunders’s counsel]: Where did you go after — after leaving the Clemons’ residence?
 

 “[Saunders]: I went back to my home where I was staying at.
 

 “[Saunders’s counsel]: You just ran back?
 

 “[Saunders]: Yes, sir, I did.”
 

 (R. 930.)
 

 Based on our thorough review of the record in light of the legal principles set out above, we conclude that Saunders has not established that defense counsel was ineffective. Based on the trial record alone, with no testimony from defense counsel about the reasons he took the actions to which Saunders now objects, we find that defense counsel made a reason
 
 *93
 
 able, tactical decision to admit to the underlying facts of the crimes, and then to argue that Saunders did not commit capital murder because he was under the influence of crack cocaine and, therefore, unable to form a specific intent.
 

 Immediately after he was arrested, Saunders confessed to killing Mr. Clemons by hitting him on the head with the crowbar he had borrowed earlier from Mr. Clemons, and he admitted that he had feigned an asthma attack to gain entry into the Clemonses’ residence, where he attacked Mrs. Clemons and took money from Mr. Clemons’s wallet and from Mrs. Clemons’s purse. Faced with Saunders’s confession, with Mrs. Clemons’s identification of Saunders at trial and her testimony at trial, and with the other testimony and evidence establishing Saunders’s participation in the crimes, defense counsel reasonably attempted to urge the jury to find Saunders guilty of lesser-included charges based on Saunders’s inability to form the specific intent to commit capital murder. In his opening argument to the jury, defense counsel argued that Saunders “snapped” while smoking crack cocaine, that he struck Mr. Clemons on the head (R. 376), and that “everything that happened afterwards would have been an afterthought” (R. 378). Defense counsel also argued in his opening statement that Saunders did not have the intent to murder or to rape Mrs. Clemons, although he admitted the State would present evidence of an assault. (R. 378.) Finally, defense counsel argued that, once the police apprehended Saunders, they did not investigate some of the details provided by Saunders and by Mrs. Clemons, and the police did not eliminate the possibility that Saunders did not act alone. In his closing argument, defense counsel argued that, while there was no question about who committed the acts against the Clemonses, the question for the jury was to determine Saunders’s intent. According to counsel, Saunders did not have the specific intent to commit capital murder because he did not plan to commit the series of crimes and the robbery and burglary were afterthoughts that arose after Saunders “snapped” and killed Mr. Clemons. Counsel also argued that the jury could conclude that Saunders’s intoxication on crack cocaine negated his specific intent to commit murder and that the jury could find Saunders guilty of manslaughter.
 

 The portion of defense counsel’s direct examination of Saunders to which Saunders now objects was entirely consistent with defense counsel’s strategy to admit to certain facts, but to challenge the prosecution’s theory regarding intent and to urge the jury to convict Saunders of lesser-included offenses. Before counsel asked the questions to which Saunders now objects, defense counsel had elicited testimony from Saunders regarding his use of crack cocaine and that when he was using crack cocaine, he was not “thinking right” (R. 920-21); Saunders had also testified that he was on the Clemonses’ property to smoke crack cocaine and that he had intended to return the crowbar. Saunders had further testified that he did not intend to burglarize the Clemonses’ home or to steal from them, but that he had hit Mr. Clemons on the head with the crowbar after Mr. Clemons had said he was going to call the police.
 

 “[Wjhen counsel fails to oppose the prosecution’s case at specific points or concedes certain elements of a case to focus on others, he has made a tactical decision.”
 
 Hunt v. State,
 
 940 So.2d 1041, 1056 (Ala.Crim.App.2005), quoting
 
 Branch v. State,
 
 882 So.2d 36, 65 (Miss.2004). Defense counsel cannot be said to have “abandoned” his client by making such strategic choices as part of the adversarial
 
 *94
 
 process.
 
 Id.
 
 Counsel here did not abandon Saunders; rather, he made a reasonable tactical decision to elicit from Saunders his admission that he had struck Mr. Clemons and had stolen money from Mr. Clemons’s wallet and from Mrs. Clemons’s purse and then ran home. This was consistent with the defense strategy — a strategy that was dictated, to a large extent, by Saunders’s own confession to the police — that focused on Saunders being so impaired by his ingestion of crack cocaine that he could not have formed the specific intent to kill. Therefore, we do not find counsel’s performance in this regard to be deficient.
 

 Furthermore, Saunders has not shown a reasonable probability that the result of his trial would have been any different if counsel had not asked the complained-of questions. The evidence against Saunders was overwhelming, and Saunders has not shown a reasonable probability that defense counsel’s questions affected either the jury’s verdicts at the guilt phase or the jury’s recommendation that Saunders receive the death sentence. Thus, based on our review of the record, we also find no prejudice as a result of counsel’s actions in this regard.
 

 Saunders cites
 
 Thompson v. Haley,
 
 255 F.3d 1292, 1303 (11th Cir.2001), in support of his argument. Thompson argued that his attorneys distanced themselves from Thompson and dehumanized Thompson in the eyes of the jury. He also argued that during the closing argument at the guilt phase of the trial, counsel had informed the jury that they were court-appointed and they argued that Thompson and his codefendant had lived on the fringes of society and had engaged in activities “outside and alien to the law.” 255 F.3d at 1303. In evaluating Thompson’s ineffective-assistance claims, the United States Court of Appeals for the Eleventh Circuit held:
 

 “Counsel’s statements in closing, as well as Counsel’s disclosure to the jury that they were court appointed, hardly comport with the fundamental duty of loyalty to a client and of ensuring ‘that the adversarial testing process works to produce a just result under the standards governing decision.’
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052. Counsel could hardly hope to persuade a jury to be merciful while at the same time stressing the immoral and worthless quality of their client’s life and also reminding the jury that they were appointed by the court to represent Thompson.... Moreover, although we recognize the need to develop and maintain credibility and rapport with the jury, it is unreasonable for trial counsel to do so at the expense of the client’s best interests.
 

 “Nonetheless, in view of the entire record, we find that Thompson has not shown a reasonable probability that Counsel’s performance affected either the jury’s verdict that he was guilty of capital murder or the jury’s recommendation of death.”
 

 255 F.3d at 1304.
 
 Thompson
 
 supports our holding here. As noted above, we find that Saunders’s trial counsel made a reasonable tactical decision based on the evidence to elicit admissions from Saunders to some of the crimes while, at the same time, demonstrating that Saunders was seriously impaired as a result of his smoking crack cocaine. Thus, as in
 
 Thompson,
 
 there is no reasonable probability that counsel’s actions undermined confidence in the outcome of this case.
 

 For the foregoing reasons, we find no plain error with regard to this issue.
 

 B.
 

 Saunders also argues that defense counsel abandoned him when he withdrew
 
 *95
 
 his request for a jury instruction on felony murder. Saunders appears to argue that, because counsel withdi*ew the request for the felony-murder instruction, the jury was left with only two choices as to the murder of Mr. Clemons: to find Saunders guilty of capital murder or to find him not guilty.
 

 The parties submitted written requested jury instructions to the court. The record reflects that the trial court held an off-the-record conference to consider the parties’ requested jury charges, and the court ruled on the requested charges. Thereafter, defense counsel objected on the record to the court’s decision not to charge the jury on felony murder. The prosecutor argued that Saunders’s defense throughout the trial had been that Saunders had no intent to commit robbery, burglary, or any other felony, so an instruction on felony murder was not supported by the evidence. Defense counsel then withdrew his objection to the trial court’s ruling on the felony murder instruction. (R. 989.)
 

 First, Saunders’s argument — that trial counsel’s abandonment of a felony-murder defense left the jury with only the option to find Saunders guilty of capital murder or not guilty of any crime — is incorrect. The trial court instructed the jury on the lesser-included offenses of manslaughter and murder. Therefore, when defense counsel withdrew his objection to the court’s decision not to instruct the jury on felony murder, he did not force the jury to find Saunders guilty of capital murder or not guilty of capital murder.
 

 Second, a jury instruction on felony murder was not consistent with the defense theory of the case, and it was not unreasonable for counsel to withdraw his objection to the court’s refusal to instruct the jury on felony murder. Felony murder requires an intent to commit the underlying felony. See, e.g.,
 
 Heard v. State,
 
 999 So.2d 992 (Ala.2007). However, Saunders testified repeatedly that he did not intend to burglarize the Clemonses’ house or to steal anything from the Clemonses. Thus, the defense theory of the case was inconsistent with a jury instruction on felony murder, and when defense counsel withdrew his objection to the court’s denial of the request for a jury instruction on felony murder, defense counsel was making a reasonable, strategic decision based on the defense theory. Because defense counsel’s decision was not unreasonable, Saunders has failed to demonstrate that counsel’s performance was deficient.
 

 Because Saunders failed to establish that defense counsel’s performance was deficient, no plain error exists as to this issue.
 

 IX.
 

 Saunders contends that the trial court erred in denying his motions for a judgment of acquittal, made at the close of the State’s case and at the close of all the evidence, because, he says, the evidence presented at trial was insufficient to support his convictions. (Issue XI in Saunders’s brief.) Specifically, Saunders argues that the evidence failed to establish “that he ever intended to take the life of Melvin Clemons, to commit any murder or burglary, or to do any other criminal act.” (Saunders’s initial brief at p. 70, Saunders’s reply brief at p. 35.) Saunders also argues that he was under the influence of crack cocaine and “that made it impossible for him to intend to do anything other than seek more drugs.” (Saunders’s reply brief at p. 36.)
 

 “Initially, we note our well-established standard for reviewing challenges to the sufficiency of the evidence: 1 “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence intro-
 
 *96
 
 dueed by the State, accord the State all legitímate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’
 
 Ballenger v. State,
 
 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting
 
 Faircloth v. State,
 
 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘ “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’
 
 Nunn v. State,
 
 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting
 
 O’Neal v. State,
 
 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’
 
 Farrior v. State,
 
 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting
 
 Ward v. State,
 
 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is
 
 legally
 
 sufficient to allow submission of an issue for decision [by] the jury.’
 
 Ex parte Bankston,
 
 358 So.2d 1040, 1042 (Ala.1978).”
 

 Oliver v. City of Opelika,
 
 950 So.2d 1229, 1230 (Ala.Crim.App.2006).
 

 Saunders was convicted of the murder of Mr. Clemons during the course of the robbery and during the course of a burglary, and of the attempted murder of Mrs. Clemons.
 

 “ ‘To sustain a conviction under § 13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a “robbery in the first degree or an attempt thereof,” as defined by § 13A-8^11; (2) a “murder,” as defined by § 13A-6-2(a)(1); and (3) that the murder was committed “during” the robbery or attempted robbery, i.e., that the murder was committed “in the course of or in connection with the commission of, or in immediate flight from the commission of’ the robbery or attempted robbery in the first degree, § 13A-5-39(2).
 
 Connolly v. State, 500
 
 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating
 
 in
 
 the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing.
 
 Davis v. State,
 
 536 So.2d 110 (Ala.Cr.App.1987);
 
 Magwood v. State,
 
 494 So.2d 124 (Ala.Cr.App.1985), aff'd,
 
 Ex parte Magwood,
 
 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing.
 
 Clark v. State,
 
 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs.
 
 Thomas v. State,
 
 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
 

 “ ‘ “As the Alabama Supreme Court held in
 
 Cobern v. State,
 
 273 Ala. 547, 142 So.2d 869 (1962), ‘the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.’
 
 Clements v. State,
 
 370
 
 *97
 
 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979);
 
 Clark v. State,
 
 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position ‘would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.’
 
 Thomas v. State,
 
 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
 

 “ ‘ “Although a robbery committed as a ‘mere afterthought’ and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see
 
 Bufford v. State,
 
 [382 So.2d 1162 (Ala.Cr.App.1980) ],
 
 O’Pry v. State,
 
 [642 S.W.2d 748 (Tex.Cr.App.1981) ], the question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve.
 
 Crowe v. State,
 
 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim’s property and fled.
 
 Cobern v. State,
 
 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant’s intent to rob the victim can be inferred where ‘[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.’
 
 Thomas v. State,
 
 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984)....”
 

 “
 
 ‘Connolly [v. State,
 
 500 So.2d 57, 63 (Ala.Crim.App.1985), aff'd, 500 So.2d 68 (Ala.1986) ].’
 

 “Hallford v. State,
 
 548 So.2d 526, 534-35 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).”
 

 Jones v. State,
 
 946 So.2d 903, 925-26 (Ala.Crim.App.2006).
 

 To sustain a conviction under § 13A-5-40(a)(4), Ala.Code 1975, the prosecution was required to prove beyond a reasonable doubt: (1) a burglary in the first or second degree or an attempt thereof; (2) a murder; and (3) that the murder was committed during the burglary or attempted burglary.
 

 “(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime:
 

 “(1) Is armed with explosives or a deadly weapon; or
 

 “(2) Causes physical injury to any person who is not a participant in the crime; or
 

 “(3) Uses or threatens the immediate use of a dangerous instrument.”
 

 § 13A-7-5, Ala.Code 1975.
 

 “(a) A person commits the crime of burglary in the second degree if he knowingly enters or remains unlawfully in a building with intent to commit theft or a felony therein and, if in effecting entry or while in the building or in immediate flight therefrom, he or another participant in the crime:
 

 “(1) Is armed with explosives or a deadly weapon; or
 

 “(2) Causes physical injury to any person who is not a participant in the crime; or
 

 “(3) Uses or threatens the immediate use of a dangerous instrument.
 

 
 *98
 
 “(b) In the alternative to subsection (a) of this section, a person commits the crime of burglary in the second degree if he unlawfully enters a lawfully occupied dwelling-house with intent to commit a theft or a felony therein.”
 

 § 13A-7-6, Ala. Code 1975.
 

 Finally, “ ‘[t]he elements of the crime of attempted murder are intent to kill and an overt act towards commission of that act.’ ”
 
 Perkins v. State,
 
 897 So.2d 457, 465 (Ala.Crim.App.2004), quoting
 
 Bradford v. State,
 
 734 So.2d 364, 369 (Ala.Crim.App.1999), citing in turn,
 
 Chaney v. State,
 
 417 So.2d 625 (Ala.Crim.App.1982). See also §§ 13A-6-2(a)(l) and 13A-4-2, Ala.Code 1975.
 

 Reviewing the evidence in the light most favorable to the State and according the State all reasonable inferences therefrom, we find that the State presented sufficient evidence to submit the case to the jury and that the trial court did not err when it denied Saunders’s motions for a judgment of acquittal. The evidence presented during the State’s case, as set forth more fully at the beginning of this opinion, established that, on the day before Saunders was to move away from the area, and after he had been watching the Clemonses for more than two months, he made up an elaborate excuse to borrow a crowbar from Mr. Clemons. Saunders told Sgt. Fuqua that he had borrowed the crowbar as a ploy to get onto the Clemonses’ property. After keeping the crowbar until past sundown, Saunders was on the Clemonses’ property when Mr. Clemons went to retrieve his crowbar. The evidence indicates that Saunders strangled the elderly man, repeatedly struck him in the face, and finally, while Mr. Clemons was standing or kneeling, Saunders struck Mr. Clemons on the head with his own crowbar. After Mr. Clemons fell to the ground, Saunders struck additional blows to Mr. Clemons’s head, killing him. The pocket of Mr. Clemons’s pants was turned inside out, and blood was found on that pocket, raising the inference that Saunders attempted to rob Mr. Clemons of any money he might have had in his pocket.
 

 Saunders next went to the Clem-onses’ house, and he feigned an asthma attack so that he could get inside. Mrs. Clemons was concerned about Saunders’s health, and she unlocked the door and allowed him to come inside. While he was inside the house, Saunders told Mrs. Clemons that he wanted money for crack cocaine and he stole money from Mr. Clemons’s wallet and from Mrs. Clemons’s purse, and he took keys to one of the Clemonses’ vehicles. Saunders also dragged Mrs. Clemons around the house by the neck and he struck her repeatedly, causing her to fall to the ground and hit her head several times and causing her to fear for her life. While he was inside the house with Mrs. Clemons, Saunders picked up a knife, a screwdriver, and an extension cord, and he approached Mrs. Clemons with each item; he dropped each of the items only after Mrs. Clemons directed him to do so. Testimony from Dr. Baggett established the severity of Mrs. Clemons’s wounds, including severe injuries to her lungs that caused her to suffer heart failure and to require treatment in the intensive care unit of a hospital.
 

 Saunders admitted that he had borrowed the crowbar from Mr. Clemons the day before he and his family were moving away from the area so that he would have a reason to be around the Clemonses’ property. He admitted that he struck Mr. Clemons on the head with the crowbar, that he feigned an asthma attack so that Mrs. Clemons would let him into the house, and that he must have gone into the house to get money for more ci-ack cocaine. Saunders also admitted that he
 
 *99
 
 struck Mrs. Clemons repeatedly and that she complained of chest pains and asked him to telephone emergency 911, but that he did not do so. Finally, Saunders admitted that after he left the Clemonses’ house, he returned to his own residence, told his brother that he had “screwed up,” and he fled the area.
 

 The evidence presented by the State established all the elements of robbery-murder, burglary-murder, and attempted murder. Therefore, the trial court did not err when it denied Saunders’s motions for a judgment of acquittal at the close of the State’s case and at the close of all the evidence.
 

 Moreover, although Mrs. Clemons testified that Saunders smoked crack cocaine in her house, and Saunders testified that he was “high” on crack cocaine at the time of the crimes, evidence of Saunders’s intoxication did not render the evidence insufficient, it merely created a question for the jury regarding Saunders’s intent.
 

 “ ‘ “[I]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” ’
 
 Seaton v. State,
 
 645 So.2d 341, 343 (Ala.Crim.App.1994), quoting
 
 McCord v.
 
 State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986). Intent 1 “ ‘may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” ’
 
 Farrior v. State,
 
 728 So.2d 691, 695 (Ala.Crim.App.1998), quoting
 
 Jones v. State,
 
 591 So.2d 569, 574 (Ala.Crim.App.1991) quoting in turn,
 
 Johnson v. State,
 
 390 So.2d 1160, 1167 (Ala.Crim.App.1980). ‘ “The intent of a defendant at the time of the offense is a jury question.” ’
 
 C.G. v. State,
 
 841 So.2d 281, 291 (Ala.Crim.App.2001),
 
 aff'd,
 
 841 So.2d 292 (Ala.2002), quoting
 
 Downing v. State,
 
 620 So.2d 983, 985 (Ala.Crim.App.1993).”
 

 Buford v. State,
 
 891 So.2d 423, 429 (Ala.Crim.App.2004). The Alabama Supreme Court discussed the degree of intoxication necessary to negate criminal intent in
 
 Ex parte Bankhead,
 
 585 So.2d 112 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). The Alabama Supreme Court stated:
 

 “In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure.
 
 Lister v. State,
 
 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases.
 
 Crosslin [v. State,
 
 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App.1986) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant’s intoxication rendered it impossible for the defendant to form a particular mental state.”
 

 585 So.2d at 121.
 

 Here, although the evidence established that Saunders ingested crack cocaine before and during the crimes, the evidence also established that Saunders acted with forethought and planning.
 
 *100
 
 There was evidence from which the jury could have concluded that Saunders planned the attack on the Clemonses earlier in the day, when he created a reason to be on the property by borrowing a crowbar; that he intended to rob and kill Mr. and Mrs. Clemons in their home late in the evening, before he and his family moved away from the area; that by lying to Mrs. Clemons about her husband being handcuffed inside a vehicle and faking an asthma attack to gain entry into the home, Saunders.had the ability to think and plan his continuing crime spree; that by forcing Mrs. Clemons to pick items up and by using Windex brand glass cleaner to remove fingerprints from items he touched, Saunders appreciated the criminality of his conduct and was attempting to eliminate evidence of his wrongdoing; and that by fleeing from the scene and admitting to others that he had “screwed up,” Saunders was not so intoxicated that he was unable to form the intent to kill. In addition, Saunders testified that the effects of crack cocaine lifted in a short amount of time, sometimes between 10 and 30 minutes, and that his mind was “almost clear” before he left the Clemonses’ house. (R. 954.) Whether Saunders was so intoxicated from the crack cocaine he smoked that he could not form the specific intent to commit the crimes for which he was convicted was a question for the jury. The jury obviously resolved that question adversely to Saunders, and we will not disturb that finding on appeal.
 

 For the foregoing reasons, the trial court did not err when it denied Saunders’s motions for a judgment of acquittal.
 

 X.
 

 Saunders contends that when the prosecutor gave her rebuttal closing argument she made an improper statement of the law regarding voluntary intoxication. (Issue XII in Saunders’s brief.) Specifically, Saunders contends that the trial court told the attorneys that it would
 
 not
 
 instruct the jury that voluntary intoxication had to rise to the level of insanity to negate specific intent, and that the prosecutor improperly told the jury that voluntary intoxication had to rise to the level of insanity before it could negate intent.
 

 During the prosecutor’s rebuttal closing argument, the following occurred:
 

 “[Prosecutor]: But the Judge is going to tell you that voluntary intoxication is not a defense and that you essentially are going to have to determine that his intoxication was such that it rose to the level of insanity and he could not form intentional—
 

 “[Saunders’s counsel]: Judge, may we approach?
 

 “At the bench:
 

 “[Saunders’s counsel]: The State had requested a jury charge which you had denied which talks about rising to the form [sic] of insanity. It’s improper argument as to what you’re going to instruct. You’re not giving that jury charge, you’ve already denied that.
 

 “[Prosecutor]: I thought it was part of his charge.
 

 “The Court: Overrule the objection.
 

 “(Bench conference concluded.)”
 

 (R. 1040-41.)
 

 “ ‘This court has stated that “[i]n reviewing allegedly improper prose-cutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.”
 
 Bankhead v. State,
 
 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds,
 
 585
 
 So.2d 112 (Ala.1991),
 
 *101
 
 aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also
 
 Henderson v. State,
 
 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908 (1992). “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’”
 
 Bankhead,
 
 585 So.2d at 107, quoting
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181 (1986) (quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.”
 
 Roberts v. State,
 
 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939 (1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.”
 
 Bankhead,
 
 585 So.2d at 106. “Questions of the propriety of argument of counsel are largely within the trial court’s discretion,
 
 McCullough v. State,
 
 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.”
 
 Bankhead,
 
 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion.
 
 Id.’
 

 “Ferguson v. State,
 
 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001).”
 

 Brooks v. State,
 
 973 So.2d 380, 396 (Ala.Crim.App.2007).
 

 Initially, we note that the charge conference is not included in the record. Although defense counsel asserted in his objection that the trial court had denied the State’s request for a jury instruction stating that voluntary intoxication had to rise to the level of insanity in order to negate intent, in response the prosecutor stated that she thought the statement regarding intoxication rising to the level of insanity would be part of the trial court’s charge. Because the charge conference is not in the record, however, this Court has no way of ascertaining which party’s recollection is correct.
 
 [13]
 

 That being said, our review of the record reveals that when the trial court instructed the jury on voluntary intoxication it did not include the requirement that intoxication reach the level of insanity in order to negate intent (R. 1065), although that statement of law would have been correct. See
 
 Ex parte Bankhead,
 
 585 So.2d 112, 121 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Furthermore, the trial court informed the jurors at the beginning of the trial that it
 
 *102
 
 would instruct them as to the law it was to apply to the facts of the case, and it is well settled that a jury is presumed to follow the trial court’s instructions. See, e.g.,
 
 Taylor v. State, 808
 
 So.2d 1148, 1187 (Ala.Crim.App.2000). Thus, although the prosecutor’s statement to the jury that the court would instruct it that intoxication had to rise to the level of insanity in order to negate intent when, in fact, the court did not give that instruction, was technically not a correct statement based on the facts in this case, the fact that intoxication must rise to the level of insanity in order to negate intent is a correct statement of the law. Therefore, we conclude that the prosecutor’s statement, which was a correct statement of the law, was not error, and the trial court properly overruled Saunders’s objection.
 

 XI.
 

 Saunders contends that the trial court erred when, between the guilt phase and the penalty phase of the trial, the court replaced a missing member of the jury with an alternate juror, who was not “privy to all of the deliberations involved in the guilt phase of the trial,” without attempting to locate the missing juror and to force his attendance. (Issue VIII in Saunders’s brief at p. 73.)
 

 The record reflects that the jury completed its deliberations and rendered verdicts in the guilt phase of Saunders’s trial during the evening of Friday, August 26, 2005. Before the trial court recessed the proceedings, it discussed with counsel and with the jurors the possibility that a hurricane that was then in the Gulf of Mexico would make landfall in Baldwin County, and the court instructed the jurors to leave their telephone numbers so that the court could contact them if the penalty phase of Saunders’s trial could not be held as scheduled on Monday, August 29, 2005, and had to be rescheduled as a result of the hurricane. When court resumed on Wednesday, August 31, 2005, the trial court stated:
 

 “THE COURT: For the record, Monday the 29th, Hurricane Katrina hit the Mississippi Gulf Coast and affected Mobile County and large parts of Baldwin County. The power was out in several areas of Baldwin County and is still out in several areas of Baldwin County.
 

 “Juror No. 41, [M.T.M.], is a — I believe, a lineman for Riviera Utilities. Whether he’s a lineman or not, he works for Riviera Utilities which is a utility company. I believe it’s owned by the City of Foley, and is responsible for electricity and gas, and I’m not sure about water and cable, both in the Foley area and on the — what’s called the Eastern Shore of Baldwin County, but the Fairhope, Daphne area. Fairhope and Daphne area was one of the areas that was hit hard by the storm surge and hurricane force winds in that area.
 

 “[M.T.M.] has not appeared this morning. We had received a message that he was helping restore power to some of the areas that were without power and may not be able to make it today.
 

 “It’s approximately 12 minutes after 9:00, so I do not believe [M.T.M.] is going to be here. We had received a call yesterday on the 30th, at least my secretary had received a call yesterday on the 30th that indicated — it wasn’t [M.T.M.], but I think it might have been his mother, indicating that he may not be here today.
 

 “So, what I had planned on doing is replacing [M.T.M.] with one of the two alternates. Everybody is back this morning except the two — except [M.T.M.]. The two alternates did not deliberate on the finding of guilt. How
 
 *103
 
 ever, the two alternates were sequestered in [the] foyer of my office during the jury’s deliberation on guilt. They did not participate in that, but they were kept separate and were instructed to not discuss the case at that time, and as far as we know, did not discuss that case.
 

 “So at this time, I will — it’s the Court’s opinion that I will — unless somebody has a better idea, to replace [M.T.M.] with Juror No. 47, which is [R.E.R.], who is the first alternate and proceed with the sentencing.”
 

 (R. 1104-05.) Saunders objected to the placement of juror R.E.R. on the jury, arguing that R.E.R. had not been “privy to the deliberations for the jury,” and that it would be improper to proceed with the alternate juror. (R. 1106.) The trial court overruled Saunders’s objection.
 

 Section 12-16-100, Ala.Code 1975, sets out the general procedure for drawing, selecting, and empaneling juries in criminal cases. Section 12 — 16—100(c) provides, in relevant part, that “[t]he last juror or jurors struck shall be the alternate or alternates, and if it becomes necessary for an alternate to replace a principal juror, the last juror struck shall be designated.” In
 
 Rocker v. State,
 
 443 So.2d 1316 (Ala.Crim.App.1983), we reviewed the trial court’s decision to replace a principal juror with an alternate juror. On the second day of trial, the court received notice that a juror’s husband had communicated with the juror and had told her to tell the trial judge that he knew the people involved in the case. The court held a hearing and took the matter under advisement. The following day, immediately before the case was submitted to the jury, the trial court replaced the principal juror with an alternate juror, and Rocker objected. This Court held that the trial court had acted in accordance with § 12 — 16—100(c), and stated:
 

 “The use of alternate jurors under this salutary statute permits the court to avoid a costly and burdensome mistrial that would otherwise be required when a juror during the trial becomes unable to perform his duties satisfactorily. We find that the trial judge made such use of this statute.
 

 “Whether it is necessary for an alternate juror to replace a principal juror under § 12-6-100(c), as amended, Code of Alabama 1975, is a decision within the sound discretion of the trial judge, subject only to review for an abuse of discretion.
 
 Winstead v. State,
 
 53 Ala.App. 222, 298 So.2d 642, cert. denied, 292 Ala. 761, 298 So.2d 646 (1974);
 
 Gaffney v. State,
 
 342 So.2d 403 (Ala.Cr.App.1976), cert. denied, 342 So.2d 404 (Ala.1977);
 
 Cox v. State,
 
 394 So.2d 103 (Ala.Cr.App.1981).”
 

 443 So.2d at 1320.
 

 Similarly, in
 
 Thomas v. State,
 
 615 So.2d 141 (Ala.Crim.App.1992), the trial court replaced a principal juror with an alternate juror when, on the second day of trial, the principal juror told the trial court that she knew the defendant’s parents. We held that the trial court had acted in accordance with § 12-16-100(c) when it replaced the principal juror with the alternate juror, and stated:
 

 “ As for the judge’s decision that the circumstances are such that a juror must be excused and replaced by an alternate or additional juror, the judge has considerable discretion here as well. Despite the fact that there are circumstances in which the defendant has a “right to have his trial completed by a particular tribunal,” the judge’s action in excusing a juror will be upheld “if the record shows some legitimate basis for his decision.” This is because the defendant has still been tried by 12 persons selected by
 
 *104
 
 him, with even those originally designated as alternates being selected in the same fashion as the other jurors.’
 

 “3 W. LaFave & J. Israel,
 
 Criminal Procedure
 
 § 21.3(e), p. 742 (1984) (footnotes omitted).”
 

 615 So.2d at 143. See also
 
 Limbaugh v. State,
 
 581 So.2d 5 (Ala.Crim.App.1991) (trial court did not abuse its discretion in replacing with an alternate a principal juror who, through an administrative error, was seated on the jury), and
 
 Calhoun v. State,
 
 530 So.2d 259 (Ala.Crim.App.1988) (trial court did not abuse its discretion in replacing with an alternate a principal juror who did not return to court after a recess).
 

 Under the circumstances of this case, we find that the trial court did not abuse its discretion when it placed the alternate juror on the jury. The trial court had received a message that the principal juror might not be able to attend the trial because he was a lineman and might be working to restore power to areas that were damaged by the hurricane that hit the Gulf coast the morning the penalty phase of Saunders’s trial was scheduled to begin. Although the circumstances presented here were not the same as those in the cases cited above, a trial court certainly has discretion under § 12-16 — 100(c) to replace a juror who is attempting to aid people in the aftermath of a natural disaster.
 

 Therefore, we find no abuse of discretion on the part of the trial court in replacing juror M.T.M. with alternate juror R.E.R., even without first attempting to contact him and force him to return for jury duty.
 

 XII.
 

 Saunders contends that the trial court erred when it refused his request at the beginning of the penalty phase of the trial that it instruct the jury that its sentencing verdict would be final and when the court instructed the jury at the conclusion of the evidence at the penalty phase of the trial that its sentencing verdict was only a recommendation. (Issue XIV in Saunders’s brief.) He also argues that the trial court erred when it refused his request at the beginning of the penalty phase of the trial that it instruct the jury that its sentencing verdict did not have to be unanimous.
 

 At the beginning of the penalty phase of the trial, the trial court gave the jury introductory instructions about how that phase of the trial would proceed but did not give any instructions regarding the law. Before opening statements were made, defense counsel made the following objection:
 

 “I don’t think you stated anything on the record — this was an advisory opinion, but when you give the instructions to the jury on this, you didn’t tell them that this would — that this had to be a unanimous decision, which it does not have to be. I think you ought to tell them your decision doesn’t have to be unanimous and that their decision is final. I think it would be appropriate to give some type of instructions to the jury at this time.”
 

 (R. 1114.) The trial court overruled Saunders’s objection and stated that it would instruct the jury regarding the law at the conclusion of the evidence.
 

 During its final charge to the jury at the penalty phase, the trial court instructed the jury that its verdict did not have to unanimous. The court instructed the jury that in order to recommend a sentence of death, at least 10 jurors had to vote for death, and that in order to recommend a sentence of life imprisonment without the possibility of parole, at least 7 jurors had to vote for that sentence. (R. 1330-31.) In addition, throughout its oral charge, the
 
 *105
 
 trial court referred to the jury’s sentencing verdict as a recommendation. After the trial court completed its charge, Saunders objected to the court’s use of the term “recommend,” and argued that the jury was not supposed to know that its verdict was only a recommendation. (R. 1334-35.) Saunders then asked the court to instruct the jury that its verdict as to the sentence would be final. The trial court denied the motion.
 

 A jury’s verdict at the penalty phase of a capital trial is advisory only. See § 13A-5-46 and § 13A-5-47, Ala.Code 1975. In Alabama, it is the trial judge, not the jury, who is the final sentencing authority. As this Court explained in addressing a similar issue in
 
 Robitaille v. State,
 
 971 So.2d 43 (Ala.Crim.App.2005):
 

 “Robitaille argues that the circuit court’s jury instruction were erroneous because they informed the jury that its verdict in the penalty phase was merely advisory.
 

 “ A trial court has broad discretion when formulating its jury instructions.
 
 See Williams v. State,
 
 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ”
 
 Self v. State,
 
 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting
 
 Porter v. State,
 
 520 So.2d 235, 237 (Ala.Cr.App.1987));
 
 see also Beard v. State,
 
 612 So.2d 1335 (Ala.Cr.App.1992);
 
 Alexander v. State,
 
 601 So.2d 1130 (Ala.Cr.App.1992).’
 

 “Williams v. State,
 
 795 So.2d 753, 780 (Ala.Crim.App.1999). We have upheld similar instructions given in the penalty phase of a capital trial. In
 
 Taylor v. State,
 
 666 So.2d 36, 50-51 (Ala.Crim. App.1994), aff'd, 666 So.2d 73 (Ala.1995), we stated:
 

 “ ‘ “[W]e reaffirm the principle that, in Alabama, the ‘judge, and not the jury, is the final sentencing authority in criminal proceedings.’
 
 Ex parte Hays,
 
 518 So.2d 768, 774 (Ala.1986);
 
 Beck v. State,
 
 396 So.2d [645] at 659 [ (Ala.1980) ];
 
 Jacobs v. State,
 
 361 So.2d 640, 644 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).”
 
 Ex parte Giles,
 
 632 So.2d 577, 583 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). “The jury’s verdict whether to sentence a defendant to death or to life without parole is advisory only.”
 
 Bush v. State,
 
 431 So.2d 555, 559 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also
 
 Sockwell v. State,
 
 [675] So.2d [4] (Ala.Cr.App.1993). “We have previously held that the trial court does not diminish the jury’s role or commit error when it states during the jury charge in the penalty phase of a death case that the jury’s verdict is a recommendation or an ‘advisory verdict.’
 
 White v. State,
 
 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).”
 
 Burton v. State,
 
 651 So.2d 641 (Ala.Cr.App.1993).’
 

 “(Footnote omitted.)”
 

 971 So.2d at 74. Therefore, the trial court did not err when it referred during its oral charge to the jury’s sentencing verdict as a recommendation.
 

 In addition, there is no requirement that the trial court instruct the jury at the beginning of the penalty phase of a capital trial that its sentencing verdict does not have to be unanimous. Although
 
 *106
 
 Rule 21.1, Ala.R.Crim.P., provides, in pertinent part, that “in the sentencing phase of the trial of a capital case, the court, may, in its discretion, instruct the jury at the beginning of the proceeding,” this rule is entirely discretionary with the trial court. Indeed, § 13A-5-46(d), Ala.Code 1975, specifically allows for instructions to be given at the conclusion of the evidence; it provides that “[ajfter hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge.” Therefore, we find no error on the part of the trial court in denying Saunders’s request that it instruct the jury at the beginning of the penalty phase of the trial that its sentencing verdict did not have to be unanimous.
 

 XIII.
 

 Saunders contends that the trial court .erred in instructing the jury on the aggravating circumstance that the murder of Mr. Clemons was especially heinous, atrocious, or cruel when compared to other capital offenses and that the trial court erred when it found that aggravating circumstance to exist. (Issue VI in Saunders’s brief.) Specifically, Saunders argues that the testimony at trial was undisputed that “[djeath, in this case, was swift, by surprise, from behind, and without warning” (Saunders’s brief at p. 63); therefore, Saunders concludes, the murder was not heinous, atrocious, or cruel. Saunders did not present these arguments to the trial court; therefore, we review them under the plain-error rule. See Rule 45A, Ala.R.App.P.
 

 In its sentencing order, the trial court made the following findings of fact regarding the aggravating circumstance that the offense was especially heinous, atrocious, or cruel:
 

 “Evidence presented by and testimony from Dr. Enstice established that Melvin Clemons was struck repeatedly in the face by something other than the crowbar that was used to cave in the back and side of his head. Testimony and evidence from Dr. Enstice also showed Melvin Clemons was choked with such force that hemorrhaging occurred prior to his death, deep within his neck and throat area. Evidence also established that Melvin Clemons was standing or kneeling in an upright position when he was first struck with the crowbar, which was then followed by several more blows to the head of Melvin Clemons with the crowbar by the Defendant.
 

 “The blows to Melvin Clemons’ face and the injuries to the neck were inflicted prior to death and if the first blow with the crowbar was to a standing or kneeling victim, as supported by the evidence, the victim could not have been unconscious. Therefore, the killing of Melvin Clemons was not immediate. The killing took place at night in the darkness of Melvin Clemons’ yard and with the knowledge of 77-year-old Melvin Clemons that his wife of 40 years, Agnes Clemons, was alone in their house and was now or soon to be the target of the Defendant, since he, Melvin Clemons, had no money on himself. It must also be assumed that Melvin Clemons knew he was going to die after the facial blows and neck/throat injury, since he knew his assailant and would be able to identify him as being the individual who borrowed the crowbar from him earlier in the day.
 

 “The evidence showed that Melvin Clemons was returning to his house when the fatal blows were delivered, which indicates he was returning to call the police or he was returning to protect his wife; either of these scenarios show
 
 *107
 
 the victim knew something was seriously wrong that night in the yard of his home.”
 

 (C.Supp. 32.)
 

 “The aggravating circumstance that the offense was especially heinous, atrocious, or cruel ‘was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’
 
 Ex parte Kyzer,
 
 399 So.2d 330, 334 (Ala.1981). In
 
 Ex parte Clark,
 
 728 So.2d 1126 (Ala.1998), the Alabama Supreme Court explained:
 

 “ ‘In
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States held that the application of certain state death penalty statutes violated the Eighth Amendment to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that those statutes’ lack of principled standards to prevent the sentencing authority from arbitrarily and capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g.,
 
 id.
 
 at 310, 92 S.Ct. 2726 (Stewart, J., concurring);
 
 id.
 
 at 311, 92 S.Ct. 2726 (White, J., concurring).
 

 “ ‘Since
 
 Furman,
 
 many states have revised them death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See
 
 Maynard v. Cartwright,
 
 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court’s
 
 post-Furman
 
 cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a “principled way to distinguish” cases in which the death penalty is appropriate from cases in which it is not. See, e.g.,
 
 Godfrey v. Georgia,
 
 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court has held that the “especially heinous, atrocious, or cruel” aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentences See
 
 Cartwright,
 
 486 U.S. at 365-66, 108 S.Ct. 1853 (upholding the Oklahoma Court of Criminal Appeals’ interpretation of the “especially heinous, atrocious, or cruel” aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
 

 “ ‘In
 
 Lindsey v. Thigpen,
 
 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court’s application of the “especially heinous, atrocious or 'cruel” aggravating circumstance because this Court’s application of it provided a “principled way to distinguish” cases in which the death penalty is appropriately imposed from cases in which it is not.
 
 Id.
 
 at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting
 
 Godfrey,
 
 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts’ interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined “especially heinous, atrocious or cruel” to include only “those conscienceless or pitiless homicides which are
 
 un
 
 
 *108
 

 necessarily torturous
 
 to the victim.”
 
 Lindsey v. Thigpen,
 
 at 1514 (quoting
 
 Ex parte Kyzer,
 
 399 So.2d 330, 334 (Ala.1981)) (emphasis added).
 

 [[Image here]]
 

 “ ‘... The State urges us to hold that the “execution-style” murder in this case, for which the record does not reflect torture of the victim, is nonetheless “especially heinous, atrocious or cruel.” Such an expansion of the aggravating circumstance set out in § 13A-5^49(8) to encompass a murder not involving torture, merely because the State labels the murder an “execution-style” slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court’s failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional.
 
 Godfrey,
 
 446 U.S. at 429, 432, 100 S.Ct. 1759.
 

 “
 
 ‘We cannot depart from the established meaning of the words enacted by the Legislature
 
 — “especially
 
 heinous, atrocious or cruel’’
 
 — and
 
 apply those words to include murders that do not involve the infliction of torture on the victim.
 

 “ ‘Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment. We are bound to retain the interpretation of “especially heinous, atrocious or cruel” that has provided a consistent and principled distinction between those murders for which the death sentence is appropriate and those for which it is not. See
 
 Cartwright,
 
 486 U.S. at 363, 108 S.Ct. 1853;
 
 Godfrey,
 
 446 U.S. at 433, 100 S.Ct. 1759.’
 

 “728 So.2d at 1137-41 (some emphasis in original; some emphasis added; footnotes omitted).
 

 “There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim. See
 
 Norris v. State,
 
 793 So.2d 847 (Ala.Crim.App.1999).”
 

 Brooks v. State,
 
 973 So.2d 380, 417-18 (Ala.Crim.App.2007).
 

 In
 
 Norris v. State,
 
 793 So.2d 847 (Ala.Crim.App.1999), this Court discussed the factor of psychological torture and its importance to a determination that an offense is especially heinous, atrocious, or cruel:
 

 “A third factor that is considered especially indicative of ‘especially heinous, atrocious or cruel’ is the infliction of psychological torture. Psychological torture can be inflicted by ‘leaving the victim in his last moments aware of, but helpless to prevent, impending death.’ [Thomas M.] Fleming, [Annot.,
 
 Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Heinous, Cruel, Depraved, or the Lilce-Post-Gr-egg Cases,
 
 63 A.L.R.4th 478,] § 2[b], at 492-93 [ (1988) ]. ‘Thus, mental suffering may be found where a victim witnesses the murder of another (particularly a family member) and then realizes that soon he or she will also be
 
 *109
 
 killed, as well as where the victim is expressly taunted "with the prospect of his or her own death.’
 
 Id.
 
 at § 2[b], at 49B (footnotes omitted).
 

 “Alabama courts have recognized that the psychological torture inflicted by a victim’s witnessing the death of a family member can be a factor making his subsequent death especially heinous, atrocious, or cruel....
 

 “... ‘[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.’
 
 Ex parte Rieber,
 
 663 So.2d 999, 1003 (Ala.),
 
 cert. denied,
 
 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
 

 “ ‘[Generally reasoning that the victims were already fearful for their lives when the fatal injuries were inflicted ..., the courts in many cases have held the proof sufficient to establish as a statutory aggravating circumstance that the murder was especially heinous, cruel, depraved, or the like, even though the victim lost consciousness or died from gunshot ... wounds instantly, within a few seconds or minutes, or otherwise without a time lapse deemed significant by the court, and without suffering other physical injury.’
 

 “Fleming, supra
 
 § 2[a], at 489-90. As with the first two factors discussed (repeated infliction of injuries and appreciable suffering after a swift assault), we find that the factor of psychological torture must have been present for an appreciable lapse of time, sufficient enough to have caused prolonged or appreciable suffering, i.e., the period of suffering must be prolonged enough to separate the crime from ‘ordinary murders for which the death penalty is not appropriate.”
 

 793 So.2d at 859-61.
 

 Here, Mr. Clemons, a 77-year-old man who was 5 feet, 7 inches tall and weighed 139 pounds, left his house on the night of his death, against the protestations of his wife, to retrieve a crowbar he had loaned to Saunders earlier that day. Mr. Clemons located Saunders and found that Saunders was smoking crack cocaine on the Clemonses’ property. Mr. Clemons was then confronted by 24-year-old Saunders, who was 5 feet, 11 inches tall and weighed 180 pounds and was wielding the crowbar he had borrowed from Mr. Clemons. As the trial court noted in its sentencing order, Dr. Enstice testified that Mr. Clemons sustained numerous nonlethal injuries to his face; Mr. Clemons suffered bruises and scrapes around his eyes, nose, and mouth, and he sustained many small cuts or lacerations to the skin around his eyes and inside his lower lip. Dr. Enstice testified that these injuries were caused by several blows to his face, and that each of the injuries to the facial area was sustained while Mr. Clemons was alive. (R. 631.) Dr. Enstice also testified about extensive injuries to the deep structures of Mr. Clemons’s neck. Those injuries, along with hemorrhages in Mr. Clemons’s upper and lower eyelids and in the white parts of his eyes, together with the external bruises and scratches on Mr. Clemons’s neck, were “indicative and very consistent with compression of the neck” (R. 634), and Dr. Enstice said that it would have required a “very, very strong force to do that.” (R. 636.) The strangulation might have rendered Mr. Clemons unconscious momentarily, Dr. Enstice said, but Mr. Clemons would have regained consciousness and could have gotten up and attempted to move away. Dr. Enstice testified that the injuries to Mr. Clemons’s
 
 *110
 
 face and neck certainly would have been painful.
 

 Dr. Enstice determined that, although the neck compression or partial strangulation could have contributed to Mr. Clemons’s death, the blunt-force trauma that fractured his skull and resulted in extensive injuries to his brain was the actual cause of death. Dr. Enstice testified that the first of the multiple, fatal blows to the head that Saunders inflicted with the crowbar was struck while Mr. Clemons was upright, either standing or kneeling, because the blood from that injury drained downward onto Mr. Clemons’s neck and upper back. According to Dr. Enstice, the blood-draining pattern from the remaining blows to the head were consistent with Mr. Clemons being facedown on the ground when those blows were struck. Death would have resulted in less than a minute following the blow to the top of the head or the blow to the right side of the head, each of which caused extensive brain damage. The remaining blows to the head were inflicted close together in time, Dr. Enstice said, and around the time of Mr. Clemons’s death. Those injuries would have been painful. Dr. Enstice also stated that if Mr. Clemons fell to the ground after Saunders struck him on the top of the head with the crowbar and incapacitated him, then the injuries to Mr. Clemons’s face and neck had to have been inflicted before Saunders hit Mr. Clemons on the head with the crowbar.
 

 Based on this evidence, the trial court reasonably concluded that Saunders struck the slightly built, elderly Mr. Clemons about the face repeatedly and strangled him, though not fatally, before he inflicted the fatal blows to Mr. Clemons’s head. The trial court reasonably inferred that during the attack Mr. Clemons would have been in fear for his own life and for that of his elderly wife, whom he had left alone inside the house. In addition, a reasonable inference could be made that Mr. Clemons attempted to fight back against Saunders, given that the knife he kept in the sheath on his belt was found underneath his body and the sheath was empty. While Mr. Clemons was in an upright position, either on his knees or standing, Saunders struck him on the head with the crowbar, incapacitating him. At the time of the fatal blows, Mr. Clemons would have been in extreme pain from all the injuries Saunders had inflicted on him up to that time, and in extreme fear for his own life and for that of his elderly wife, who was alone in the house. Mr. Clemons would have known that his own death was imminent because he could not overcome the attack by the younger, larger man, and he would have been aware that his wife would likely be the next victim of Saunders’s violence.
 

 Thus, we conclude that all three factors that are generally recognized as indicating that the offense was especially heinous, atrocious, or cruel are present in this case. Saunders used violence beyond that necessary or sufficient to cause death when he repeatedly struck and then strangled Mr. Clemons before inflicting the fatal blows. The initial blows inflicted by Saunders and the strangulation would have been painful and would have caused appreciable suffering. Finally, Mr. Clemons suffered extreme psychological trauma because he knew that his death was imminent and that he was be unable to protect his wife, who was alone in their house.
 

 For these reasons, we find no error, much less plain error, in the trial court’s instructing the jury on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, or in the trial court’s finding the existence of that aggravating circumstance.
 

 
 *111
 
 XIV.
 

 Saunders contends that the death penalty is unconstitutional. (Issue XV in Saunders’s brief.) Saunders argues both that the death penalty constitutes cruel and unusual punishment per se, and that the lethal-injection procedure used in Alabama inflicts unnecessary pain and suffering and constitutes cruel and unusual punishment. Saunders did not raise either of these claims in the trial court; therefore, we review them under the plain-error rule. See Rule 45A, Ala.R.App.P.
 

 In his brief, Saunders makes a general allegation that the death penalty is per se cruel and unusual punishment; however, he does not make any specific arguments in support of this claim. The United States Supreme Court has held that the imposition of the death penalty as a sentence for capital murder is not per se unconstitutional. See
 
 Gregg v. Georgia,
 
 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In addition, Alabama’s capital-murder statute has been upheld against a variety of constitutional challenges. See, e.g.,
 
 Clark v. State,
 
 896 So.2d 584 (Ala.Crim.App.2000), and cases cited therein. This Court has also held that lethal injection does not constitute per se cruel and unusual punishment. See, e.g.,
 
 McNabb v. State,
 
 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein. Therefore, Saunders’s general claim that the death penalty constitutes cruel and unusual punishment is meritless.
 

 Saunders also argues that the lethal-injection protocol used in Alabama provides for the use of sodium pentathol, pan-curonium bromide, and potassium chloride, which, he says, results in the “willful infliction of unnecessary and gratuitous pain and suffering,” and constitutes cruel and unusual punishment. (Saunders’s brief at p. 76.) Because Saunders raises this claim for the first time on appeal, the record before us contains no evidence about the protocol for lethal injection or about the effects of the drugs on the body when the drugs are injected. Thus, we have nothing to support Saunders’s allegations and no basis for concluding that plain error exists as to this claim.
 

 In addition, in
 
 Lewis v. State,
 
 [Ms. CR-03-0480, November 2, 2007] — So.3d - (Ala.Crim.App.2006) (opinion on return to remand), this Court recently addressed this same issue:
 

 “As we stated in
 
 Bryant v. State,
 
 951 So.2d 732, 747-48 (Ala.Crim.App.2003) (opinion on return to remand):
 

 “ ‘We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in
 
 Travis v. State,
 
 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See, e.g.,
 
 [Sims] v. State,
 
 754 So.2d 657, 668 (Fla.2000);
 
 State v. Carter,
 
 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000);
 
 Ritchie v. State,
 
 809 N.E.2d 258, 262 (Ind.2004);
 
 Wheeler v. Commonwealth,
 
 121 S.W.3d 173, 186 (Ky.2003). Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
 

 [[Image here]]
 

 “See also
 
 Brown v. State,
 
 11 So.3d 866 (Ala.Crim.App.2007);
 
 Belisle v. State,
 
 11 So.3d 256 (Ala.Crim.App.2007);
 
 Brooks v. State,
 
 973 So.2d 380 (Ala.Crim.App.2007). In addition to Alabama, other
 
 *112
 
 states have likewise rejected constitutional challenges to execution by lethal injection, finding this method is almost ‘ “universally recognized as the most humane method of execution, and least apt to cause unnecessary pain.’”
 
 State v. Webb,
 
 252 Conn. 128, 145, 750 A.2d 448, 457 (2000) (citing, in turn,
 
 Woolls v. McCotter,
 
 798 F.2d 695, 698 (5th Cir.), cert. denied, 478 U.S. 1031 (1986);
 
 Kelly v. Lynaugh,
 
 862 F.2d 1126, 1135 (5th Cir.1988), cert. denied, 492 U.S. 925 (1989);
 
 Hill v. Lockhart,
 
 791 F.Supp. 1388, 1394 (E.D.Ark.1992);
 
 Felder v. Estelle,
 
 588 F.Supp. 664, 674 (S.D.Tex.1984);
 
 State v. Hinchey,
 
 181 Ariz. 307, 315, 890 P.2d 602 (1995);
 
 State v. Deputy,
 
 644 A.2d 411, 421 (Del.Super.1994);
 
 People v. Stewart,
 
 123 Ill.2d 368, 386, 123 Ill.Dec. 927, 528 N.E.2d 631 (1988), cert. denied, 489 U.S. 1072 (1989);
 
 State v. Moen,
 
 309 Or. 45, 98-99, 786 P.2d 111 (1990);
 
 Hopkinson v. State,
 
 798 P.2d 1186, 1187 (Wyo.1990)). We note, however, that since this Court released its decision in
 
 Bryant,
 
 one California court has held that lethal injection ‘as actually administered in practice’ violates the prohibition against cruel and unusual punishment. See
 
 Morales v. Tilton,
 
 465 F.Supp.2d 972, 974 (N.D.Cal.2006). Moreover, on September 25, 2007, the United States Supreme Court announced that it would consider whether execution by lethal injection violated the Eighth Amendment’s prohibition against cruel and unusual punishment. See
 
 Baze v. Rees,
 
 551 U.S. 1192 (2007). Until the United States Supreme Court provides further guidance on this issue, we decline to revisit our holding in
 
 B'ryant
 
 and its progeny, given the number of other jurisdictions that have rejected the merits of a similar claim.”
 

 — So.3d at -.
 

 Moreover, we note that although § 15-18-82.1(a), Ala.Code 1975, provides that the primary method of execution in Alabama is lethal injection, unless the person sentenced to death elects to be executed by electrocution, the statute also provides that if lethal injection is held unconstitutional by the United States Supreme Court or by the Alabama Supreme Court, “all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution.” § 15-18-82.1(c), Ala.Code 1975. See also § 15-18-82.1(h), Ala.Code 1975 (“In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.”). Therefore, even if Alabama’s lethal-injection protocol were found to be unconstitutional, Saunders would not be entitled to a reversal of his death sentence.
 

 For these reasons, Saunders is not entitled to relief on either of these claims.
 

 XV.
 

 Citing
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), Saunders contends that he has a mental disability as a result of his abusive upbringing and that he is therefore not subject to the death penalty. Saunders did not present this argument to the trial court; therefore, we review it for plain error. See Rule 45A, Ala.R.App.P.
 

 In
 
 Atkins,
 
 the United States Supreme Court held that the execution of mentally retarded capital offenders violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution.
 
 *113
 
 In his brief to this Court, Saunders “concedes that psychological testing that was done does not appear to have indicated that he is mentally retarded.” (Saunders’s brief at p. 78.)
 
 [14]
 
 Despite the fact that Saunders concedes that he is not mentally retarded, he nevertheless argues that “[f]or the same reasons that the mentally retarded may not be executed, Timothy Saunders contends that he fits that pattern as well.” (Saunders’s brief at p. 78.) However, we find nothing in the
 
 Atkins
 
 opinion that even remotely suggests that the United States Supreme Court intended its holding to extend beyond mentally retarded offenders to those offenders with a history of child abuse, and Saunders’s attempt to extend the
 
 Atkins
 
 holding to his case is unpersuasive. Therefore, Saunders is not entitled to any relief on this claim of error.
 

 XVI.
 

 In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Saunders’s capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
 

 We have also reviewed Saunders’s sentence in accordance with § 13A-5-53(a), Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Saunders’s capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court’s findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.
 

 After the jury convicted Saunders of two counts of capital murder, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury unanimously recommended a sentence of death.
 

 Thereafter, the trial court held another hearing, in accordance with § 13A-5-47,
 
 *114
 
 Ala.Code 1975, to aid it in determining whether it would sentence Saunders to life imprisonment without the possibility of parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its sentencing order, the trial court entered specific written findings concerning the existence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, that it found to exist, the existence or nonexistence of each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Saunders’s participation in it.
 

 We note that the trial court did not enter specific written findings as to each of the statutory aggravating circumstances that it found not to exist. However, after its findings regarding the aggravating circumstances that it found to exist, the court then stated in its order: “No aggravating circumstances other than those listed above were established by the State.” (C.Supp. 32.) In addition, at the conclusion of the final sentencing hearing, the trial court imposed the death penalty and stated its findings as to aggravating and mitigating circumstances. After the trial court explained the aggravating circumstances that it found to exist, it then stated: “Now, that appears to be the only aggravating circumstances that would be applicable — or that the court finds to be applicable in this case.” (R. 1355.) Although the trial court’s order was not in full compliance with § 13A-5-47(d), Ala. Code 1975, because it did not make findings regarding each aggravating circumstance that it found not to exist, such a technical omission is harmless. In
 
 Gavin v. State,
 
 891 So.2d 907 (Ala.Crim.App.2003), the trial court entered specific findings as to the three aggravating circumstances that it found to exist, but did not refer to the remaining aggravating circumstances listed in the statute, as required by § 13A-5-47(d), Ala. Code 1975. This Court acknowledged the omission, but found the error to be harmless, stating:
 

 “[I]n
 
 Stewart v. State,
 
 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999), this Court held that a trial court’s failure to make specific written findings regarding those aggravating circumstances in § 13A-5^9, Ala.Code 1975, that it found not to exist was harmless. We stated:
 

 “ ‘[T]he trial court did not “enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49” as required by § 13A-5-47, Ala.Code 1975. Nevertheless, we find this omission to be harmless.
 

 “ ‘ “While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. ‘The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.’
 
 Ex parte Kyzer,
 
 399 So.2d 330, 338 (Ala.1981). ‘[T]he harmless error rule does apply in capital cases at the sentence hearing.’
 
 Ex parte Whisenhant,
 
 482 So.2d 1241, 1244 (Ala.1983). ‘As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are “so clear and convincing that virtually no reasonable person could differ,” a harmless error analysis can be
 
 *115
 
 used.’
 
 Baldwin v. State,
 
 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed,
 
 Ex parte Baldwin,
 
 456 So.2d 129, 140 (Ala.1984). See also
 
 Barclay v. Florida,
 
 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983);
 
 Thompson v. State,
 
 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed,
 
 Ex parte Thompson,
 
 503 So.2d 887 (Ala.), cert. denied,
 
 Thompson v. Alabama,
 
 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). We emphasize that ‘the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances.’
 
 Berard v. State,
 
 402 So.2d 1044, 1051 (Ala.Cr.App.1980).”
 

 “
 
 ‘Fortenberry v. State,
 
 545 So.2d 129, 144 (Ala.Cr.App.1988).
 

 “ ‘There is nothing to indicate that the trial court refused or failed to consider any aggravating circumstances. Furthermore, this court has before it a sufficient basis for reviewing the appellant’s death sentence.
 
 Slaton v. State,
 
 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997);
 
 Fortenberry,
 
 supra;
 
 Kyzer,
 
 supra. Therefore, the appellant’s argument is without merit.’
 

 “730 So.2d at 1219.
 

 “Similarly, the record here indicates that the trial court did not refuse or fail to consider any applicable aggravating circumstances. At the sentencing hearing before the jury and the sentencing hearing before the court, the State argued the existence of only three aggravating circumstances, the same three that the trial court expressly found to exist. Moreover, given the court’s express finding as to the existence of three aggravating circumstances, it is clear that the court found the remaining aggravating circumstances listed in § 13A-5-49, Ala.Code 1975, not to exist and, thus, we have a sufficient basis to review the propriety of Gavin’s death sentence. Therefore, we conclude that the defect in the court’s sentencing order was a technical error without injury to Gavin.”
 

 891 So.2d at 995-96 (footnote omitted). See also
 
 Bryant v. State,
 
 951 So.2d 732, 747 (Ala.Crim.App.2003) (remand not required when trial court listed only the aggravating circumstances it found to exist). Although this Court has remanded cases for the correction of the technical deficiency present here, it has done so only when the sentencing order had additional defects to be corrected. See
 
 Gavin,
 
 891 So.2d at 996 n. 33, and the cases cited therein. However, under the circumstances of this case, where it is clear that the trial court considered all the statutory aggravating circumstances and specifically found four aggravating circumstances to exist, and where the court specifically stated that it had found that no other aggravating circumstances existed, we conclude that the deficiency in the sentencing order is harmless.
 

 In its findings, the trial court found the existence of four statutory aggravating circumstances: (1) that the murder was committed during the course of a robbery, see § 13A-5-49(2), AIa.Code 1975; (2) that the murder was committed during the course of a burglary, see § 13A-5-49(4), Ala.Code 1975; (3) that the murder was committed by a person under sentence of imprisonment, see § 13A-5-49(l), Ala.Code 1975; and (4) that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court also found the existence of three statutory miti
 
 *116
 
 gating circumstances: (1) that Saunders had no significant history of prior criminal activity, see § 13A-5-50(l), Ala.Code 1975; (2) that the capital offense was committed while Saunders was under the influence of extreme mental or emotional disturbance, see § 13A-5-50(2), Ala.Code 1975; and (3) that Saunders was 24 years old at the time of the crime, see § 13A-5-50(7), Ala.Code 1975. The trial court also heard testimony and argument regarding Saunders’s character and record and any of the circumstances of the offense that Saunders offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found as non-statutory mitigating circumstances:
 

 “There was evidence presented by [Saunders’s] sister, Marie Young, of their childhood and the difficulties they had. It appears there were numerous changes of residence, with several being only a few months in length and most being substandard housing. [Saunders] grew up in and around the Mid-Atlantic states of South Carolina, North Carolina, and Virginia. [Saunders’s] family life was contentious with alcoholism and violence being the norm. (This was further evidenced by the fact that Marie Young, who lives in South Carolina, was the only family member who attended more than one day of the week-long trial. A woman, who is believed to be [Saunders’s] mother and who lives locally, attended for a couple of hours of trial on one day and who did not sit with her daughter, Marie).
 

 “[Saunders] did, however, move to Baldwin County, Alabama to live with his mother and brother, which shows to the Court there was not a total breakdown of the Saunders’ family unit. [Saunders’s] mother and father did divorce when [Saunders] was a child.
 

 “[Saunders] admitted to having used drugs and having a drug problem, but there was conflicting testimony as to the length and depth of the drug usage. [Saunders] was able to find employment after moving to Baldwin County, working in construction as a framer and roofer and was employed at the time of his arrest for the murder of Melvin Clemons. Though [Saunders] and his siblings may have had a difficult childhood, only one of the six surviving children of L.B. Reed Saunders and Pat Saunders has a felony arrest record.”
 

 (S.R. 33-34.)
 

 The trial court’s sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Saunders to death. The trial court’s findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.
 

 Saunders was convicted of murder committed during the course of a robbery and of murder committed during the course of a burglary. These offenses are defined by statute as capital offenses. See § 13A-5-40(a)(2) and (4), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the State. See, e.g.,
 
 Gavin v. State,
 
 891 So.2d 907, 997 (Ala.Crim.App.2003), and the cases cited therein involving murders committed during the course of a robbery;
 
 Hall v. State,
 
 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), and the cases cited therein involving murders committing dui'ing the course of a burglary-
 

 
 *117
 
 After carefully reviewing the record of the guilt phase and of the penalty phase of Saunders’s trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The trial court’s findings and conclusions are amply supported by the evidence. This Court has independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court’s judgment that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed and considering Saunders, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
 

 For the foregoing reasons, Saunders’s capital-murder convictions and his sentence of death are affirmed. In addition, Saunders’s conviction and life sentence for attempted murder are also affirmed.
 

 AFFIRMED.
 

 MeMILLAN, WISE, and WELCH, JJ., concur.
 

 BASCHAB, P.J., recuses herself.
 

 [1]
 

 . The victims’ surname is spelled two different ways in the record — “Clemons” and "Clemmons.” We use “Clemons” in this opinion.
 

 [2]
 

 . Saunders was also indicted for the attempted rape of Mrs. Clemons and for burglary. The jury found Saunders not guilty of the attempted-rape charge and, because it was a lesser-included offense of the capital-murder-during-a-burglary charge, the jury did not return a verdict on the burglary charge.
 

 [3]
 

 .Mr. Clemons’s nickname was "Curly.”
 

 [4]
 

 . Mrs. Clemons testified that, throughout the ordeal, Saunders struck her several times.
 

 [5]
 

 . The record contains one volume of copies of some of the exhibits from the trial. The volume is separately paginated, and pages from that volume are designated "(Ex._)" in this opinion.
 

 [6]
 

 .
 
 The attorney who was initially appointed to represent Saunders on appeal filed a "no merit” brief pursuant to
 
 Anders v. California,
 
 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and requested permission to withdraw as Saunders's counsel. On April 17, 2006, this Court granted counsel’s request to withdraw; struck the
 
 Anders
 
 brief counsel had filed; appointed new counsel to represent Saunders on appeal; and directed newly appointed counsel to file a brief with this Court.
 

 [7]
 

 . Although not argued by Saunders on appeal, we find that the error in destroying the questionnaires does not rise to the level of plain error.
 

 [8]
 

 . During the trial, before testimony about Saunders’s statement was given, Saunders referred to "our previous court hearing and motion to suppress" (R. 695), but the record does not contain a transcript of a hearing on Saunders’s motion to suppress. We note, however, that nothing in the record indicates that Saunders requested that pretrial hearings be recorded and, even if he had, he did not request on the Reporter’s Transcript Order that the suppression hearing be included in the record on appeal. See, e.g.,
 
 Broadnax v. State,
 
 825 So.2d 134 (Ala.Crim.App.2000). Therefore, our review of this issue is based on the testimony presented at trial.
 

 [9]
 

 . Dr. Brodsky testified at the penalty phase of the trial that, based on his evaluation of Saunders one year after Saunders had committed . die crimes, he concluded that Saunders suffered from a major depressive disorder and polysubstance dependency. However, Dr. Brodsky did not testify that the disorders prevented Saunders from voluntarily waiving his rights before he gave his confession. See
 
 Click
 
 v.
 
 State,
 
 695 So.2d
 
 209, 217-218
 
 (Ala.Crim.App.1996).
 

 [10]
 

 . In his initial brief, Saunders refers to only two specific pages of the record that he claims contained improper testimony from Dr. Enstice. However, in his reply brief, Saunders lists several additional pages of Dr. Enstice's testimony. Saunders also did not object to these portions of Dr. Enstice’s testimony at trial.
 

 [11]
 

 . Saunders does not challenge on appeal the trial court's denial of the motion in limine as it related to the pending charges he had in South Carolina. Moreover, we have reviewed the record and find no error in the trial court’s ruling in that regard.
 

 [12]
 

 . The record actually reflects that, after the trial court held a charge conference, defense counsel withdrew his objection to the court's decision not to charge the jury on felony murder. (R. 989-90.)
 

 [13]
 

 . The record does include a written requested jury charge that states: “Voluntary intoxication is no defense unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure.” (C. 120.) However, there is no indication on the face of that document whether it was submitted by the prosecutor or by Saunders. In addition, although the document does have a checkmark on the line indicating that the charge was not given, because the charge conference is not in the record before us, this Court cannot determine whether the trial court indicated, when denying the requested charge, that it would give a substantially similar instruction.
 

 [14]
 

 . The case-action summary indicates that defense counsel and the State intended to have Saunders undergo psychiatric testing, and the court imposed a deadline within which defense counsel had to notify the State if counsel intended to argue that Saunders was mentally retarded. (C. 2.) No testimony about the examinations appears in the record, however, nor did defense counsel argue at trial that Saunders was mentally retarded. Joanne Terrell, the social worker who testified on Saunders's behalf at the penalty phase of the trial, testified that she did not conduct any psychological tests, but that Saunders did not appear to be significantly retarded. (R. 1257.)